**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JOHN STANA and RANDALL WAGNER, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAS INSTITUTE INC., THE BOARD OF DIRECTORS OF SAS INSTITUTE INC., THE RETIREMENT COMMITTEE OF SAS INSTITUTE INC. and JOHN DOES 1- 30. <br><br> Defendants. | **CIVIL ACTION NO.: 5:24-cv-00105-D** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs John Stana and Randall Wagner ("Plaintiffs"), by and through their attorneys, on behalf of the SAS Retirement Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include SAS Institute, Inc. ("SAS" or "Company") and the Board of Directors of SAS Institute, Inc. and its members during the Class Period ("Board")[2] and the

---

[1]The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] As discussed in more detail below, the Class Period is defined as February 22, 2018 through the date of judgment ("Class Period").

Retirement Committee of SAS Institute, Inc. and its members during the Class Period ("Committee").

2. To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Investment Committee et al.*, 761 F.3d 346, 356 (4th Cir. 2014).

3. The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See,* "*A Look at 401(k) Plan Fees,*" *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4. The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

5. At all times during the Class Period, the Plan had at least $2.4 billion dollars in assets under management. The Plan's assets under management for all funds as of December 31, 2018 was $2,420,527,820 and by 2022 the assets under management had risen to $2,844,761,857.

2

2018 Auditor Report at 5 and 2022 Auditor Report at 17. In 2018, plans with over $1 billion in assets made up only 0.01 percent of all plans in the United States.[3]

6. The Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a jumbo plan, the Plan had substantial bargaining power to obtain the most cost-efficient investments. Defendants, however, did not exercise appropriate judgment in scrutinizing each investment option, initially and on an ongoing basis, that was offered in the Plan to ensure it was prudent.

7. Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

8. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II. JURISDICTION AND VENUE

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

11. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. THE PLAN'S INVESTMENTS

13. Several investments were available to Plan participants as investment options each year during the putative Class Period.

14. At the beginning of 2018 to at least year-end 2022, the Plan's assets included the American Funds Fundamental Investor in the R6 share class. 2018 Auditor Report at 15 and 2022 Auditor Report at 17. The Plan's assets also included the JPMorgan Chase Bank SmartRetirement Passive Blend CF-B Target Date Funds ("JPMCB CF-B Target Date Funds") from the beginning of the putative Class Period to at least the start of 2023.

15. Target date funds are designed to provide a single diversified investment vehicle for plan participants. The target date refers to the participant's expected retirement year. For example, "target date 2030" investments are designed for individuals who intend to retire in 2030.

4

16. The JPMCB SmartRetirement Pasv Blnd CF-B Target Date Funds are not mutual funds, but collective investment trusts ("CITs"). A CIT is a tax-exempt, pooled investment vehicle available only to qualified retirement plans and certain governmental retirement plans (as defined in Internal Revenue Code Section 414(d)). Many CITs, like the JPMCB SR PB CF-B Target Date Funds, have a similar structure to mutual funds.

17. JPMorgan has offered target date funds dating as far back as several years before the start of the Class Period. The CF-B share class was not available until June 1, 2017. However, the original share class was known as the CF share class and has been available since December 31, 2010. The two share classes are identical (in terms of underlying holdings) except for a minor difference in cost between the two share classes.

18. For ease of reference, each iteration of the JPMorgan target date funds, whether CF or CF-B share classes, CITs or mutual funds, will be referred to herein as the "JPMorgan Target Date Funds" where applicable.

19. Lastly, the JPMorgan CF-B Target Date Funds corresponding with the various target years, *e.g.,* 2030, 2035, 2040, etc,, are referred to collectively herein as the "JPMCB CF-B Target Date Series."

## IV. PARTIES

### Plaintiffs

20. Plaintiff, John Stana ("Stana"), resides in Easton, Pennsylvania. During his employment, Plaintiff Stana participated in the Plan investing in the options offered by the Plan and challenged in this lawsuit. Plaintiff Stana specifically invested in the JPMCB CF-B Target Date Funds, specifically the JPMCB CF-B 2030 fund and suffered injury to his Plan account due to significant underperformance of the funds, including the 2030 fund. In addition, Plaintiff Stana suffered injury to his Plan account by having to pay for his share of consulting fees, which were

5

unreasonable, because consulting fees paid to Aon Investments USA, Inc ("Aon") cannot be justified given the lower performing funds in the Plan.

21.     Plaintiff, Randall Wagner ("Wagner"), resides in Garner, North Carolina. During his employment, Plaintiff Wagner participated in the Plan investing in the options offered by the Plan and challenged in this lawsuit. Plaintiff Wagner specifically invested in the JPMCB CF-B Target Date Funds, specifically the JPMCB CF-B 2025 fund and suffered injury to his Plan account from the significant underperformance of the funds, including the 2025 fund. In addition, Plaintiff Stana suffered injury to his Plan account by having to pay for his share of consulting fees, which were unreasonable, because consulting fees paid to Aon cannot be justified given the under performing funds in the Plan.

22.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein. In particular, each Plaintiff suffered injury because of the underperformance of the Plan's JPMCB CF-B Target Date Funds and the American Funds Fundamental Investor fund. Additionally, each Plaintiff suffered injury to their Plan account by having to pay for their share of consulting fees to maintain the underperforming funds in the Plan. From 2018 to 2022, the Plan paid Aon a total of, at least, $553,280 to assist in maintaining and selecting the investments in the Plan. Aon and the Plan's fiduciaries' performance was abysmal thus making the consulting fees unjustified for the services provided.

23.     Plaintiffs did not have knowledge of all material facts (including, among other things, how target date funds in a retirement plan should perform as compared to their peers and

6

benchmarks) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

24. SAS is a named fiduciary of the Plan with a principal place of business at SAS Campus Drive, Cary, NC 27513. 2022 Form 5500 of the SAS Retirement Plan ("2022 5500") at 1. SAS is in the data analytics business.[4] SAS currently employs thousands of individuals and customers worldwide. *Id.*

25. SAS, directly or acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate and performed well as compared to their peers. The Investment Policy Statement of SAS Retirement Plan as amended and restated effective December 2022 ("IPS") at 2. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

26. Accordingly, SAS during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

27. For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

---

[4] https://www.sas.com/en_us/company-information/why-sas.html last accessed on October 23, 2023.

28.     The Board appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate and performed well as compared to their peers. IPS at 2.  As noted above, under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

29.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

30.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

31.     The Committee's role is to ensure that the investments available to the Plan's participants are appropriate and performed well as compared to their peers. IPS at 2.

32.     The IPS further defines the Committee's role in selecting and monitoring the investment choices available in the Plan as follows: "the Plan's investment options will be selected to: 1. [m]aximize return …; 2. [p]rovide returns comparable to returns for similar investment options … ." *Id.* The Committee is further responsible for "a. [s]electing investment options; c. [p]eriodically evaluating the investment performance of each fund in the Plan and deciding on investment option changes … ." IPS at 7.

33.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan's assets.

8

34.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

35.     To the extent that there are additional officers, employees and/or contractors of SAS who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, SAS officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## V.  CLASS ACTION ALLEGATIONS[5]

36.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between February 22, 2018 through the date of judgment (the "Class Period").

---

[5] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

37. The members of the Class are so numerous that joinder of all members is impractical. The 2022 Form 5500 lists 8,477 Plan "participants with account balances as of the end of the plan year." 2022 Form 5500 at 2.

38. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

39. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.    Whether Defendants are/were fiduciaries of the Plan;

    B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

    C.    Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D.    The proper form of equitable and injunctive relief; and

    E.    The proper measure of monetary relief.

40. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the

vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

41. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI. THE PLAN

43. The Plan is a defined contribution plan covering substantially all eligible employees of SAS. 2020 Auditor Report at 10. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *Id*. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

*Eligibility*

44. In general, the Plan covers all employees of SAS who have completed 90 days of service and are 21 years of age. *Id.*

***Contributions***

45. There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

46. With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id.* Each participant may "contribute up to 80% of their annual compensation" and are "automatically enrolled as a participant in the Plan and shall be deemed to have elected to defer 6% of his/her compensation as a deferral contribution to the Plan …" *Id.* With regard to contributions made by the employer, SAS will make a matching contribution equal to 100% of salary deferrals that does not exceed the first 6% of eligible compensation.". *Id.*

47. Like other companies that sponsor 401(k) plans for their employees, SAS enjoys both direct and indirect benefits by providing matching contributions to the Plan's participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

48. SAS's employees benefit in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

49.     Given the size of the Plan, SAS likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

50.     Participants are automatically vested in any contributions they made to their accounts themselves and any safe harbor contributions made by SAS. 2020 Auditor Report at 10.

## VII.   THE TOTALITY OF CIRCUMSTANCES DEMONSTRATES THAT THE PLAN'S FIDUCIARIES FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.  Overview

#### 1.   ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology for Evaluating Investments

51.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

52.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.  As noted above, these fiduciary duties are the highest known to law. *Tatum*, 761 F.3d at 356.

53.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery.  *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without

pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

54.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Defendants to request, among other things, the Committee's meeting minutes.  This request was made on August 8, 2023. By letter dated August 29, 2023, SAS denied the Plaintiffs' request for meeting minutes.

55.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

56.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors.

57.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…" DOL 408(b)(2) Regulation Fact Sheet.

58.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[7]

59.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

60.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

61.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

62.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

63.    The specific methodologies used to select prudent investments are primarily data driven. Such data is provided by investment research companies like Morningstar, which is the

---

[7] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

most accepted source of investment performance information, as it has the most robust information on mutual funds, CITs, and other types of investments.  Indeed, Morningstar is used and trusted by virtually all financial professionals and fiduciaries.

64.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

65.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.")

66.     Lastly, to the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA."  *Lauderdale v. NFP Retirement*, *Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

### 2.  The Target Date Funds in the Plan

67.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's JPMCB CF-B Target Date Funds.

68.     At the start of the Class Period the Plan held more than $970 million dollars in the JPMCB CF-B Target Date Series. 2018 Auditor Report at 15.  By 2022, the amount invested had reached $1.2 billion dollars. 2022 Auditor Report at 17. With such a large amount invested in the JPMCB CF-B Target Date Series, the Plan would have been able to choose virtually any available target date funds for the Plan by the start of the Class Period.

69.    Indeed, there was no shortage of prudent choices.  Beginning in 1994, the market for target date funds exploded with numerous investment managers offering a variety of different target date funds (both mutual funds and CITs alike).

70.    By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

71.    Established target date investment managers include, but are not limited to, American Funds, TIAA-CREF and T.Rowe Price. T.Rowe has offered target date funds for more than 20 years and American Funds, TIAA-CREF and MFS for approximately 15 years and those target date funds have provided stable investment returns to 401(k) plan participants.  The T.Rowe Price Retirement Target Date Series, the American Funds Target Date R6 Series, the TIAA-CREF Lifecycle Index Institutional Series and MFS Target Date Series will all be referred to as the "Comparator Funds."

72.    As relevant here, JPMCB SR PB CF-B Target Date Series are the only target date investing options in the Plan. In other words, participants in the Plan who want to invest in a target date strategy have no choice other than the JPMCB SR PB CF-B Target Date Series.

73.    Defendants, in particular, the Committee, were obligated under ERISA to carefully evaluate the JPMCB CF-B Target Date Series before selecting them for inclusion in the Plan. The Committee was also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the JPMCB CF-B Target Date Series on an ongoing basis thereafter.

### 3. The American Funds Fundamental Investor R6

74.    As noted earlier, another of the Plan's investments is the American Funds Fundamental Investor R6, ticker RFNGX ("American Funds Fundamental Investor"), which was a Large Blend fund.

17

75. Large Blend funds have their own Morningstar Category, namely the Morningstar Large Blend Category. In 2018, for example, there were 1,402 funds that made up the Large Blend Category. Similarly, the Large Blend Category has its own index which was created by Morningstar to track how an average fund in this category should perform, this index is known as the Morningstar US Large-Mid Cap TR USD Index, ticker MSEGLMCA ("Large Blend Index").

**B. The Plan's Fidcuiaries Failed to Adequately Monitor and Remove the Challenged Plan Invesments**

*The JPMCB SR PB CF-B Target Date Series Significantly Underperformed Its Peers and Benchmarks*

76. Prior to the start of the Class Period, the JPMorgan Target Date Funds (*i.e.*, both the CF and subsequent CF-B share classes) underperformed its peers and its Morningstar benchmark. Taking the 2040 Target Date as an example, since at least 2015 the JPMorgan Target Date Funds underperformed on a 3- and 5- year average basis.

77. The JPMorgan Target Date Funds consistently materially underperformed industry-accepted benchmarks for target date funds used by investment professionals. Based on this data there's no justifiable reason why this fund would have been selected for the Plan or would have been permitted to continue to languish unheeded during the Class Period.

78. The graph below demonstrates that the JPMorgan Target Date 20240 fund, for example, generally performed well below the applicable index, the Morningstar Lifetime Mod

18

2040 TR USD index, while the Comparator Funds performed generally above from the 3 years preceding the Class Period through 2022.[8]



79.      Given the long history of underperformance, it's inexplicable why the JPMCB CF-B Target Date Series would have been included as a Plan investment option by the start of the Class Period and kept in place.

80.      In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance at least yearly based primarily on the funds 3- and 5-year performance histories. IPS at 7.

81.      Here, from 2018, the JPMCB CF-B 2040 fund performed well below its index for

---

[8] Similar results are seen for the remaining target date years, 2025 through 2055 in five year increments, for the JPMCB SR PB CF-B Series as shown in the charts attached hereto at Appendix "A." Appendix A includes the Callan GlidePath as a comparator fund.

15 consecutive quarters as demonstrated in the graph above. Clearly this fund should not have been included in the Plan or at the very least should have been removed and replaced with one of the many better performers in its peer universe as early as the start of the Class Period. Failure to do so is in violation of ERISA and the Plan's own IPS. Under ERISA, the IPS becomes part of the legal document governing the Plan and the Plan fiduciaries are obligated to follow it. *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241-42 (2d Cir. 1989). The Plan fiduciaries failed in this regard.

82. Had the Plan fiduciaries been following their own IPS, the JPMCB CF-B Target Date Series would not have been eligible to be selected for or continued to be maintained in the Plan given its performance.

### The JPMCB SR PB CF-B Was an Imprudent Investment for the Plan Based on MPT Analysis

83. Investment professionals and fiduciaries charged with putting the interests of plan participants ahead of all else utilize Modern Portfolio Theory or MPT to help determine, along with underperformance data, when an investment strategy is imprudent.

84. The Restatement of Trusts describes MPT as follows: "[t]his standard requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust". UPIA § 2(b) (Unif. Law Comm'n 1995); Restatement (Third) of Trusts § 90(a) (2007) (*See Birse v. CenturyLink, Inc.*, 2019 WL 9467530, * 5 (D. Col. Oct. 23, 2019).

85. "Modern portfolio theory has been adopted in the investment community and, for the purposes of ERISA, by the Department of Labor. *See* 29 C.F.R. § 2550–404a–1 (directing plan fiduciaries to consider, *inter alia*, 'the role [an] investment or investment course of action plays in

that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties'…). "Under ERISA, the prudence of investments or classes of investments offered by a plan must be judged individually. That is, a fiduciary must initially determine, and continue to monitor, the prudence of each investment option available to plan participants. Here the relevant 'portfolio' that must be prudent is each available Fund considered on its own…not the full menu of Plan funds." *DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 423 (4th Cir. 2007).

86.     Some of the metrics used to evaluate investments under the Modern Portfolio Theory are as follows:

- Returns - Absolute, relative to its peers, and against its respective benchmark.
- Beta - A measure of a fund's sensitivity to market movements.
- Standard Deviation - This statistical measurement of dispersion about an average, depicts how widely a mutual fund's returns varied over a certain period of time. Investors use the standard deviation of historical performance to try to predict the range of returns that are most likely for a given fund. When a fund has a high standard deviation, the predicted range of performance is wide, implying greater volatility.
- Sharpe Ratio - It is calculated by using standard deviation and excess return to determine reward per unit of risk.  The higher the Sharpe ratio, the better the fund's historical risk-adjusted performance.

87.     According to a recent article, among the top ten modern portfolio criteria used in selecting core fund line-ups are:[9]

- Performance v. benchmarks

---

[9]     *See* 2020 Planadviser Retirement Plan Adviser Survey, available at *https://www.planadviser.com/research/2020-planadviser-retirement-plan-adviser-survey/?pagesec=2*

- Total performance (5-yr return)

- Fee structure for plan

- Alpha, beta and standard deviations

- Upside/Downside capture ratio

- Sharpe ratio

88. Looking at MPT statistics for the JPMCB CF-B Target Date Funds compared to the Comparator Funds clearly show why the JPMCB CF-B Target Date Funds were imprudent and were not selected or maintained with the sole interest of Plan participants in mind. The below compares the three and five year risk factors, as of the Third Quarter 2023, and some of the Comparator Funds identified above.

| 3 Year Risk a/o 3Q 2023 | S/D | Beta | Sharpe | % Rank in Cat |
|---|---|---|---|---|
| | | | | |
| JPMCB SR PB 2020 CF-B CIT | 9.04 | 0.78 | -0.14 | 71 |
| TRP Ret Hy 2020 Tr-4 CIT | 10.89 | 0.94 | 0.11 | 3 |
| TRP Ret I 2020 I | 10.76 | 0.93 | 0.08 | 3 |
| Am 2020 Trgt Ret R6 | 9.82 | 0.84 | 0.03 | 10 |
| MMSelect TRP Ret 2020 I | 10.78 | 0.93 | 0.08 | 4 |
| MFS LT 2020 R6 | N/A | N/A | N/A | |
| | | | | |
| Bench: Morn LT Mod 2020 | 11.49 | | -0.16 | |
| | | | | |
| 5 Year Risk a/o 3Q 2023 | S/D | Beta | Sharpe | % Rank in Cat |
| | | | | |
| JPMCB SR PB 2020 CF-B CIT | 9.28 | 0.83 | 0.10 | 79 |
| TRP Ret Hy 2020 Tr-4 CIT | 11.76 | 1.04 | 0.24 | 3 |
| TRP Ret I 2020 I | 11.77 | 1.04 | 0.23 | 3 |
| Am 2020 Trgt Ret R6 | 9.52 | 0.85 | 0.24 | 10 |
| MMSelect TRP Ret 2020 I | 11.82 | 1.04 | 0.22 | 4 |
| MFS LT 2020 R6 | | | | |
| | | | | |
| Bench: Morn LT Mod 2020 | 11.09 | | 0.11 | |
| | | | | |

22

| 3 Year Risk a/o 3Q 2023 | S/D | Beta | Sharpe | % Rank in Cat |
|---|---|---|---|---|
| | | | | |
| JPMCB SR PB 2030 CF-B CIT | 12.54 | 0.92 | 0.09 | 31 |
| TRP Ret Hy 2030 Tr-4 CIT | 13.42 | 0.99 | 0.20 | 1 |
| TRP Ret I 2030 I | 13.23 | 0.97 | 0.17 | 4 |
| Am 2030 Trgt Ret R6 | 12.17 | 0.90 | 0.12 | 16 |
| MMSelect TRP Ret 2030 I | 13.28 | 0.98 | 0.16 | 5 |
| MFS LT 2030 R6 | 11.38 | 0.84 | 0.12 | 15 |
| | | | | |
| Bench: Morn LT Mod 2030 | 13.50 | | -0.03 | |
| | | | | |
| | | | | |
| 5 Year Risk a/o 3Q 2023 | S/D | Beta | Sharpe | % Rank in Cat |
| | | | | |
| JPMCB SR PB 2030 CF-B CIT | 13.04 | 0.95 | 0.17 | 60 |
| TRP Ret Hy 2030 Tr-4 CIT | 14.51 | 1.06 | 0.26 | 1 |
| TRP Ret I 2030 I | 14.41 | 1.05 | 0.25 | 1 |
| Am 2030 Trgt Ret R6 | 12.41 | 0.91 | 0.27 | 2 |
| MMSelect TRP Ret 2030 I | 14.48 | 1.05 | 0.24 | 1 |
| MFS LT 2030 R6 | 12.48 | 0.91 | 0.22 | 20 |
| | | | | |
| Bench: Morn LT Mod 2030 | 13.59 | | 0.13 | |
| | | | | |
| 3 Year Risk a/o 3Q 2023 | S/D | Beta | Sharpe | % Rank in Cat |
| | | | | |
| JPMCB SR PB 2040 CF-B CIT | 15.29 | 0.97 | 0.23 | 20 |
| TRP Ret Hy 2040 Tr-4 CIT | 15.78 | 1.00 | 0.28 | 1 |
| TRP Ret I 2040 I | 15.60 | 0.99 | 0.23 | 15 |
| Am 2040 Trgt Ret R6 | 15.11 | 0.96 | 0.22 | 32 |
| MMSelect TRP Ret 2040 I | 15.68 | 1.00 | 0.22 | 19 |
| MFS LT 204 R6 | 15.13 | 0.96 | 0.29 | 1 |
| | | | | |
| Bench: Morn LT Mod 2040 | 15.62 | | 0.16 | |
| | | | | |
| 5 Year Risk a/o 3Q 2023 | S/D | Beta | Sharpe | % Rank in Cat |
| | | | | |
| JPMCB SR PB 2040 CF-B CIT | 16.06 | 0.97 | 0.21 | 53 |
| TRP Ret Hy 2040 Tr-4 CIT | 16.79 | 1.02 | 0.28 | 1 |
| TRP Ret I 2040 I | 16.65 | 1.01 | 0.26 | 3 |

| | | | | |
|---|---|---|---|---|
| Am 2040 Trgt Ret R6 | 15.74 | 0.95 | 0.29 | 1 |
| MMSelect TRP Ret 2040 I | 16.72 | 1.01 | 0.26 | 5 |
| MFS LT 204 R6 | 16.31 | 0.99 | 0.26 | 12 |
| | | | | |
| Bench: Morn LT Mod 2040 | 16.43 | | 0.17 | |

89. Had the Plan fiduciaries been following their own IPS and following generally accepted standards fiduciaries are charged with, the JPMCB CF-B Target Date Funds would never had been selected as an investment fund, and if it had, it would have been removed shortly after the start of the Class Period.

### *The Fundamental Investor Significantly Underperformed Its Peers and Benchmarks*

90. Using a rolling three-year average performance by quarter, on a total return basis, it is clear that, beginning in early 2019, the American Funds Fundamental Investor fund significantly underperformed its peers and the Large Blend Index. The relevant peer funds are the JPMorgan US Equity R6 fund, the Jensen Quality Growth I fund and the Touchstone Large Cap Focused Instl fund ("Large Blend Comparator Funds"). The Large Blend Comparator Funds are only a small selection of potentially 500 funds that would have been better choices for the Plan since the Large Blend Category is made up of, on average, more than 1,000 funds in any given year and the Large Blend Index is meant to track the average performance in this Category.

91. In addition, the American Funds Fundamental Investor had some of the worst Morningstar rankings in the Large Blend Category. In 2021 the fund ranked in the 84th percentile, meaning that out of the 1,382 funds available that year, 1,160 of them would have been better choices for the Plan. Similarly, the American Funds Fundamental Investor ranked in the 59th percentile in both 2018 and 2020 and ranked in the 68th percentile in 2019.

92. The Large Blend Comparator Funds are accurate and meaningful comparators to the American Funds Fundamental Investor fund because Morningstar places all four funds in the

Large Blend Category. All of the more than 1,000 funds placed in this Category by Morningstar share a similar holdings concentration.

93. The chart below, using a 3-year rolling average by quarter, on a total return basis, demonstrates that the three Comparator Funds performed generally well above the Large Blend Index while the American Funds Fundamental Investor performed generally well below this Index.



94. As demonstrated above, the American Funds Fundamental Investor fund, in black, began showing signs of underperformance in the second quarter of 2019 and never recovered. Although the fund tracked slightly below the average of all funds in the Large Blend Category, by 2019, this category average began to significantly underperform the category index, the Large Blend Index. This should have been a signal to the Plan fiduciaries to inquire of the fund managers why many of the funds in this category had performed above the index while the category itself

25

had dropped behind. Had the Plan fiduciaries done so, they would have learned that the American Funds Fundamental Investor fund was clinging to an ineffective strategy and would have sought to change to a fund that had performed above the Large Blend Index as many funds in the Large Blend Category continued to do.

### *The American Funds Fundamental Investor Was and Imprudent Investment for the Plan Based on MPT Analysis*

95. Looking at MPT statistics for the American Funds Fundamental Investor compared to the Large Blend Comparator Funds clearly show why the American Funds Fundamental Investor was imprudent and was not selected or maintained with the sole interest of Plan participants in mind. The below compares the three and five year risk factors, as of November 30, 2023, and the Large Blend Comparator Funds identified above.

| 3 Year Risk (LCB) | S/D (11/30/23) | Beta (11/30/23) | Sharpe (11/30/23) | % Rank in Cat |
|---|---|---|---|---|
| | | | | |
| Am Fund Invs R6 (RFNGX 5/1/09) | 17.06 | 0.96 | 0.44 | 57th |
| JPM US Equ R6 (JUEMX 9/30/10) | 17.31 | 0.98 | **0.49** | **24th** |
| State Street US Core Eq (SSAQX 1/2/80) | 17.15 | 0.97 | **0.49** | **38th** |
| Touchstone LC Foc I (SCRLX 12/23/14) | 16.75 | 0.94 | **0.49** | **28th** |
| Cat :Large Blend | 17.29 | 0.96 | 0.42 | |

| 5 Year Risk (LCB) | S/D (11/30/23) | Beta (11/30/23) | Sharpe (11/30/23) | % Rank in Cat |
|---|---|---|---|---|
| | | | | |
| Am Fund Invs R6 (RFNGX 5/1/09) | 18.63 | 0.96 | 0.54 | 67th |
| JPM US Equ R6 (JUEMX 9/30/10) | 19.22 | 1.00 | **0.67** | **4th** |
| State Street US Core Eq (SSAQX 1/2/80) | 18.87 | 0.99 | **0.67** | **7th** |
| Touchstone LC Foc I (SCRLX 12/23/14) | 18.72 | 0.97 | **0.66** | **5th** |
| Cat :Large Blend | 19.16 | 0.98 | 0.54 | |

96. The American Funds Fundamental Investor had significantly underperformed its Large Blend Index from early 2019, until at least, the middle of 2023. Had the Plan fiduciaries been following their own IPS and following generally accepted standards fiduciaries are charged

26

with, this fund would have been placed on a watchlist as early as the beginning of 2020 with its removal warranted, thereafter, after at the end of the second quarter of 2020 since the fund, by that time, had shown significant underperformance for four consecutive quarters.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

97. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

98. At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

99. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

100. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to select prudent investment options or failing to replace investment options when they became imprudent.

101. The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with imprudent investment options that cost the Plan's participants potential retirement benefits.

27

102. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to investment return damages. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

103. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

104. The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against SAS and the Board Defendants)**

105. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

106. SAS and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Prudence Defendants and were aware that the Prudence Defendants had critical responsibilities as fiduciaries of the Plan.

107. In light of this authority, the Monitoring Defendants had a duty to monitor the Prudence Defendants to ensure that the Prudence Defendants were adequately performing their

fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Prudence Defendants were not fulfilling those duties.

108. The Monitoring Defendants also had a duty to ensure that the Prudence Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

109. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a) Failing to monitor and evaluate the performance of the Prudence Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Prudence Defendants' imprudent actions and omissions;

(b) failing to monitor the processes by which the Plan's investments were evaluated; and

(c) failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent and poorly performing investments within the Plan all to the detriment of the Plan and Plan participants' retirement savings.

110. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

111.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Prudence Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a

30

constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.　　Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.　　An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.　　Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of the Plan's fiduciaries deemed to have breached their fiduciary duties;

I.　　An award of pre-judgment interest;

J.　　An award of costs pursuant to 29 U.S.C. § 1132(g);

K.　　An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.　　Such other and further relief as the Court deems equitable and just.

Dated: June 3, 2024　　　　　　　　　**CAPOZZI ADLER, P.C.**

Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Admitted Pro Hac Vice*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
Telephone:　(610) 890-0200
Fax: (717) 233-4103

**MATHESON & ASSOCIATES, PLLC**

*/s/ John Szymankiewicz*

John Szymankiewicz
NC Attorney ID # 41623
127 West Hargett Street, Suite 100
Raleigh, NC 27601
Email:  john@mathesonlawoffice.com
Phone: (919) 335-5291
Fax: (919) 516-0686
*Local Civil Rule 83.1 Counsel for Plaintiffs and Putative Class*

*Counsel for Plaintiffs and the Putative Class*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 3, 2024, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:  *ls/ Mark K. Gyandoh*
Mark K. Gyandoh

Case 5:24-cv-00105-D-RN     Document 16     Filed 06/03/24     Page 33 of 33