# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

JOHN STANA and RANDALL WAGNER, individually and on behalf of all others similarly situated,

        Plaintiffs,

    v.

SAS INSTITUTE INC., THE BOARD OF DIRECTORS OF SAS INSTITUTE INC., THE RETIREMENT COMMITTEE OF SAS INSTITUTE INC., and JOHN DOES 1-30,

        Defendants.

Case No. 5:24-CV-00105-D

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

WOMBLE BOND DICKINSON (US) LLP

Pressly M. Millen (NC Bar No. 16178)
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Phone: 1.919.755.2135
Fax: 1.919.755.6067
press.millen@wbd-us.com

MORGAN, LEWIS & BOCKIUS LLP

Deborah S. Davidson
Matthew A. Russell
110 North Wacker Drive, Suite 2800
Chicago, IL 60606
Phone: 1.312.324.1000
Fax: 1.312.324.1001
deborah.davidson@morganlewis.com
matthew.russell@morganlewis.com

Jared R. Killeen
2222 Market Street
Philadelphia, PA 19103
Phone: 1.215.963.5478
Fax: 1.215.963.5001
jared.killeen@morganlewis.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND .............................................................................. 5

      A.    The Plan. ................................................................................................. 5

      B.    The JPM TDFs. ....................................................................................... 6

      C.    Plaintiffs' Comparator TDFs. ................................................................. 7

      D.    Plan Contributions and Forfeitures. ....................................................... 8

      E.    Plaintiffs' Claims ................................................................................... 10

III.  ARGUMENT ...................................................................................................... 10

      A.    The Court Should Dismiss Plaintiffs' Imprudence Claim. ................... 10

            1.    ERISA Does Not Provide a Cause of Action for Plaintiffs Alleging
                  Underperforming Investments. ................................................... 10

            2.    The JPM TDFs Did Not Perform Poorly, Even on Plaintiffs'
                  Terms. ......................................................................................... 13

            3.    The Comparator TDFs Are Not Meaningful Benchmarks. ....... 14

      B.    The Court Should Dismiss Plaintiffs' Forfeiture Claims. ..................... 17

            1.    ERISA Does Not Require Increasing Plaintiffs' Benefits Under the
                  Plan. ............................................................................................ 17

            2.    Plaintiffs' Claims Are Foreclosed by Decades of Settled Law That
                  Permits Using Forfeitures to Provide Benefits to Other Plan
                  Participants................................................................................... 19

            3.    Plaintiffs' Claims Fail Because They Challenge Corporate
                  Decisions SAS Made in a Settlor Capacity................................ 23

            4.    The SAC Does Not Plausibly Allege Any Breach of Fiduciary
                  Duty (Counts I and II)................................................................ 25

            5.    Plaintiffs Do Not State an Anti-Inurement Claim (Count III). ... 28

      C.    Plaintiffs' Failure-to-Monitor Claim Fails (Count IV) ........................ 30

IV.   CONCLUSION................................................................................................... 30

**Page(s)**

**Cases**

*Abel v. CMFG Life Ins. Co.*,
  2024 WL 307489 (W.D. Wis. Jan. 26, 2024) ............................................................................15

*Albert v. Oshkosh Corp.*,
  47 F.4th 570 (7th Cir. 2022) .....................................................................................................2

*Alessi v. Raybestos-Manhattan, Inc.*,
  451 U.S. 504 (1981)...................................................................................................................4

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
  137 F.4th 1015 (9th Cir. 2025) .......................................................................................1, 2, 15

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
  579 F. Supp. 3d 1133 (N.D. Cal. 2022) ...............................................................................8, 17

*Barragan v. Honeywell Int'l Inc.*,
  2024 WL 5165330 (D.N.J. Dec. 19, 2024)...........................................................................3, 26

*Barragan v. Honeywell Int'l Inc.*,
  2025 WL 2383652 (D.N.J. Aug. 18, 2025) ...................................................................3, 19, 26

*Beldock v. Microsoft Corp.*,
  2023 WL 3058016 (W.D. Wash. Apr. 24, 2023)......................................................................1

*Bozzini v. Ferguson Enters. LLC*,
  2025 WL 1547617 (N.D. Cal. May 29, 2025).........................................................................26

*Bracalente v. Cisco Sys.*,
  2024 WL 2274523 (N.D. Cal. May 20, 2024)...........................................................7, 11, 15

*Bracalente v. Cisco Sys., Inc.*,
  2023 WL 5184138 (N.D. Cal. Aug. 11, 2023) .......................................................................11

*Cain v. Siemens Corp.*,
  2025 WL 2172684 (D.N.J. July 31, 2025)................................................................................3

*Cano v. The Home Depot, Inc.*,
  1:24-cv-03793-TRJ (N.D. Ga. Aug. 26, 2025), ECF No. 34.............................................3, 26

*Cho v. Prudential Ins. Co. of Am.*,
  2021 WL 4438186 (D.N.J. Sept. 27, 2021) ............................................................................14

i

*Christensen v. Harris County*,
529 U.S. 576 (2000)..................................................................................................................23

*Collins v. Ne. Grocery, Inc.*,
2025 WL 2383710 (2d Cir. Aug. 18, 2025).......................................................................2, 11

*Conkright v. Frommert*,
559 U.S. 506 (2010)..................................................................................................................27

*Curtiss-Wright v. Schoonejongen*,
514 U.S. 73 (1995)....................................................................................................................17

*Davis v. Salesforce.com, Inc.*,
2022 WL 1055557 (9th Cir. Apr. 8, 2022) ...............................................................................2

*Davis v. Wash. Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ...................................................................................................10

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ...................................................................................................28

*Dimou v. Thermo Fisher Sci. Inc.*,
2024 WL 4508450 (S.D. Cal. Sept. 19, 2024)........................................................3, 22, 26, 29

*Dzinglski v. Weirton Steel Corp.*,
875 F.2d 1075 (4th Cir. 1989) ...........................................................................................17, 18

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015)..................................................................................................................23

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) .....................................................................................................5

*Evans v. Assoc. Banc-Corp.*,
2022 WL 4638092 (E.D. Wis. Sept. 30, 2022).......................................................................14

*First Nat. Bank of Chicago v. Comptroller of Currency of U.S.*,
956 F.2d 1360 (7th Cir. 1992) .................................................................................................28

*Fumich v. Novo Nordisk Inc.*,
2025 WL 2399134 (D.N.J. Aug. 19, 2025) ..........................................................................3, 30

*Gagliano v. Reliance Standard Life Ins. Co.*,
547 F.3d 230 (4th Cir. 2008) .......................................................................................17, 18, 26

*Giarratano v. Johnson*,
521 F.3d 298 (4th Cir. 2008) ...................................................................................................28

ii

*Goines v. Valley Cmty. Servs. Bd.*,
  822 F.3d 159 (4th Cir. 2016) ....................................................................................5

*Gonzalez v. Northwell Health, Inc.*,
  632 F. Supp. 3d 148 (E.D.N.Y. 2022) ......................................................................14

*Greenbrier Hotel Corp. v. Unite Here Health*,
  719 F. App'x 168 (4th Cir. 2018) .............................................................................24

*Hall v. Capital One Fin. Corp.*,
  2023 WL 2333304 (E.D. Va. Mar. 1, 2023) .............................................1, 7, 15, 17

*Holliday v. Xerox Corp.*,
  732 F.2d 548 (6th Cir. 1984) ...................................................................................30

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999)........................................................................................ *passim*

*Hughes v. Nw. Univ.*,
  595 U.S. 170 (2022)........................................................................11, 12, 16, 28

*Hutchins v. HP Inc.*,
  737 F. Supp. 3d 851 (N.D. Cal. 2024) ..............................................19, 22, 27, 30

*Hutchins v. HP Inc.*,
  767 F. Supp. 3d 912 (N.D. Cal. 2025) .................................................... *passim*

*Kendall v. Pharm. Prod. Dev., LLC*,
  2021 WL 1231415 (E.D.N.C. Mar. 31, 2021) .........................................2, 11, 14

*Laboy v. Bd. of Trs. of Bldg. Serv.*,
  513 F. App'x 78 (2d Cir. 2013) ..................................................................................1

*In re LinkedIn ERISA Litig.*,
  2021 WL 5331448 (N.D. Cal. Nov. 16, 2021) .........................................................17

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996)........................................................................................ *passim*

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) ..............................................................................23, 24

*Luckett v. Wintrust Fin. Corp.*,
  2024 WL 3823175 (N.D. Ill. Aug. 14, 2024) ..........................................................15

*Madrigal v. Kaiser Found. Health Plan, Inc.*,
  2025 WL 1299002 (C.D. Cal. May 2, 2025) ...........................................3, 19, 26, 29

iii

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985)...................................................................................................24

*Matney v. Barrick Gold of N. Am.*,
  80 F.4th 1136 (10th Cir. 2023) ................................................................... *passim*

*Matousek v. MidAmerican Energy Co.*,
  51 F.4th 274 (8th Cir. 2022) ..............................................................................2, 14, 16

*McWashington v. Nordstrom, Inc.*,
  2025 WL 1736765 (W.D. Wash. June 23, 2025)............................................................3, 26

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) ..................................................................... *passim*

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993)...................................................................................................23

*Middleton v. Amentum Parent Holdings, LLC*,
  2025 WL 2229959 (D. Kan. Aug. 5, 2025) .............................................................3, 19, 22

*Moon v. BWX Techs., Inc.*,
  577 F. App'x 224 (4th Cir. 2014) ....................................................................24, 25

*Naylor v. BAE Systems, Inc.*,
  2024 WL 4112322 (E.D. Va. Sept. 5, 2024)................................................... *passim*

*Nykiel v. Smith & Nephew, Inc.*,
  2025 WL 2347549 (D. Mass. July 11, 2025),

*Nykiel v. Smith & Nephew, Inc.*,
  2025 WL 2347430 (D. Mass. Aug. 13, 2025) .......................................................................3

*Partida v. Schenker, Inc.*,
  2024 WL 1354432 (N.D. Cal. Mar. 29, 2024)................................................................7, 17

*Partida v. Schenker Inc.*,
  2025 WL 948123 (N.D. Cal. Mar. 28, 2025)................................................................1, 11

*Patterson v. Morgan Stanley*,
  2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) .......................................................................14

*Pegram v. Herdrich*,
  530 U.S. 211 (2000)...................................................................................................23

*Phillips v. Cobham Advanced Elec. Sol's, Inc.*,
  2024 WL 3228097 (N.D. Cal. June 28, 2024).......................................................................11

iv

*Phillips v. Cobham Advanced Elec. Sols., Inc.*,
No. 23-cv-03785-EKL (N.D. Cal. Mar. 21, 2025), ECF No. 75 ...........................................15

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*,
541 U.S. 1 (2004).......................................................................................................................29

*Sievert v. Knight-Swift Transp. Holdings, Inc.*,
780 F. Supp. 3d 870 (D. Ariz. 2025) .................................................................................22, 26

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ..................................................................................... *passim*

*Pension Benefits Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v.
Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)......................................................................................................12

*Steen v. Sonoco Prod. Co.*,
No. 4:24-cv-03105-JD (D.S.C. June 4, 2025), ECF No. 38 .......................................3, 26, 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)......................................................................................................................5

*Tullgren v. Booz Allen Hamilton*,
2023 WL 2307615 (E.D. Va. Mar. 1, 2023) ....................................................... *passim*

*U.S. Airways, Inc. v. McCutchen*,
569 U.S. 88 (2013).....................................................................................................................18

*Wehner v. Genentech, Inc.*,
2025 WL 2505672 (9th Cir. Sept. 2, 2025) .........................................................................1, 2

*White v. Chevron Corp.*,
2017 WL 2352137 (N.D. Cal. May 31, 2017).....................................................................1, 11

*Wright v. JPMorgan Chase & Co.*,
2025 WL 1683642 (C.D. Cal. June 13, 2025), ................................................... *passim*

*Wright v. Oregon Metallurgical Corp.*,
360 F.3d 1090 (9th Cir. 2004) .............................................................................................18, 25

**Statutes**

26 U.S.C. §§ 1-9834 ........................................................................................................................19

26 U.S.C. § 401(a) ..............................................................................................................20, 21, 22

26 U.S.C. § 4975............................................................................................................................20

29 U.S.C. § 1103(c)(1)...........................................................................................................10, 20, 29

29 U.S.C. § 1104(a)(1)..............................................................................................10, 12, 27, 28

29 U.S.C. § 1144(d) ...................................................................................................................28

29 U.S.C. § 1202............................................................................................................................20

Case 5:24-cv-00105-D-RN     Document 37     Filed 09/04/25     Page 8 of 39

## I. INTRODUCTION

The Second Amended Complaint ("SAC") shows that Plaintiffs' lawsuit is just one more copycat ERISA class action in search of a theory. Plaintiffs are two former employees of SAS Institute Inc. ("SAS") who allege Defendants breached ERISA's fiduciary duties by mismanaging the SAS Retirement Plan (the "Plan"). Their First Amended Complaint ("FAC") challenged SAS' decision to offer two investment options in the Plan: the JPMorgan SmartRetirement Passive Blend Target Date Funds ("JPM TDFs") and the American Funds Fundamental Investor Fund ("American Fund"). Plaintiffs' claims rested on the flawed premise that the challenged investments were imprudent because they did not produce market-leading returns. The Court dismissed the FAC for failure to state a claim because allegations that the JPM TDFs underperformed "cannot support a breach of imprudence claim"—and, regardless, Plaintiffs "failed to plausibly allege[] underperformance." Dkt. 25 ("Order") at 9-10. The Court also held Plaintiffs lacked standing to challenge the American Fund because neither Plaintiff invested in it. *Id.* at 11.

The SAC offers more of the same while failing to address these fatal pleading deficiencies. To start, the SAC doubles down on the same performance-based challenge to the JPM TDFs that this Court rejected. Courts within the Fourth Circuit—including this one—have made clear that "ERISA simply does not provide a cause of action for fiduciary breaches based solely on a fund participant's disappointment in the fund's performance." *Hall v. Capital One Fin. Corp.*, 2023 WL 2333304, at *6 (E.D. Va. Mar. 1, 2023) (dismissing similar challenge to TDFs).[1] Plaintiffs ignore

---

[1] *See also Tullgren v. Booz Allen Hamilton*, 2023 WL 2307615, at *6 (E.D. Va. Mar. 1, 2023) (same); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015 (9th Cir. 2025) ("*Anderson II*"); *Wehner v. Genentech, Inc.*, 2025 WL 2505672, at *1 (9th Cir. Sept. 2, 2025); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1154 n.15 (10th Cir. 2023); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822-23 (8th Cir. 2018); *Laboy v. Bd. of Trs. of Bldg. Serv.*, 513 F. App'x 78, 79-80 (2d Cir. 2013); *Partida v. Schenker Inc.*, 2025 WL 948123, at *2 (N.D. Cal. Mar. 28, 2025) ("*Partida II*"); *Beldock v. Microsoft Corp.*, 2023 WL 3058016, at *3 (W.D. Wash. Apr. 24, 2023) (collecting cases); *White v. Chevron Corp.*, 2017 WL 2352137, at *20 (N.D. Cal. May 31, 2017) ("*White*

1

the Court's holding and repeat the same implausible underperformance allegations without offering any *new* allegations suggesting the JPM TDFs were imprudent. Plaintiffs' total reliance on alleged underperformance once again dooms their claim.

Even if performance alone could support a fiduciary-breach claim, the SAC relies on the same immaterial "underperformance" the Court deemed insufficient. *See* Order at 9-10. In dismissing Plaintiffs' claim the last time, the Court made clear that "alleged underperformance [] between one and four percent of a benchmark [] fails to state a plausible ERISA claim" as a matter of law. *Id.* That is all the SAC alleges here—that the JPM TDFs' performance was within 3% of the proposed comparators. Thus, Plaintiffs' claim fails again.

Plaintiffs' investment claim also fails because the SAC does not allege a sound basis of comparison for the JPM TDFs. Every Court of Appeals to address similar claims—including the Second, Sixth, Seventh, Eighth, Ninth, and Tenth Circuits—has held that to plausibly allege that a "prudent fiduciary in like circumstances" would have removed a given investment, the complaint must at least establish a "meaningful benchmark" for evaluating the fund at issue.[2] This Court has agreed in dismissing similar claims filed by Plaintiffs' same counsel. *See Kendall v. Pharm. Prod. Dev., LLC*, 2021 WL 1231415, at *4-6 (E.D.N.C. Mar. 31, 2021) (Dever, J.). Plaintiffs fail to satisfy this pleading burden because their own allegations and public information confirm their comparators are meaningfully different from the JPM TDFs.

Next, the SAC adds a brand-new challenge to SAS' use of "forfeitures" in the Plan—*i.e.*, employer contributions that are forfeited by retirement plan participants who leave employment

---

*I*'), *aff'd*, 752 F. App'x 453 (9th Cit. 2018).

[2] *See Collins v. Ne. Grocery, Inc*., 2025 WL 2383710, at *2 (2d Cir. Aug. 18, 2025); *Anderson II*, 137 F.4th at 1022; *Wehner*, 2025 WL 2505672, at *1; *Matney*, 80 F.4th at 1148; *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 581 (7th Cir. 2022); *CommonSpirit*, 37 F.4th at 1166; *Meiners*, 898 F.3d at 822; *Davis v. Salesforce.com, Inc.*, 2022 WL 1055557, at *2 n.1 (9th Cir. Apr. 8, 2022).

2

before those contributions vest. Plaintiffs have jumped on the bandwagon of recent lawsuits by claiming that ERISA required SAS to use forfeitures to pay Plan-related expenses, rather than to provide benefits to other Plan participants. The theory here, like in other copycat cases, is that using forfeitures to offset employer contributions amounts to "self-dealing" by the employer even though those monies are used *solely to provide benefits to participants*. As in other complaints, Plaintiffs want to force SAS to pay for Plan expenses it expressly *did not* agree to pay, through increased employer contributions over and above those it committed to provide.

Unfortunately for Plaintiffs, the majority of "district courts faced with similar claims have concluded [that] the premise underlying plaintiffs' forfeiture-related causes of action is implausible." *McWashington v. Nordstrom, Inc.*, 2025 WL 1736765, at *14 (W.D. Wash. June 23, 2025) (collecting cases); *see also Naylor v. BAE Systems, Inc.*, 2024 WL 4112322, at *6 (E.D. Va. Sept. 5, 2024) (dismissing similar claims); Order, *Steen v. Sonoco Prod. Co.*, No. 4:24-cv-03105-JD (D.S.C. June 4, 2025), ECF No. 38 (same).[3] The Department of Labor ("DOL") agrees that these claims lack merit. *See* Brief for the U.S. Sec'y of Labor, as Amici Curiae Supporting Respondents, *Hutchins v. HP Inc.*, No. 25-826, Dkt. No. 24 (9th Cir. July 9, 2025) ("DOL Br."). Plaintiffs push the same implausible theory here, which fails for numerous reasons.

**First,** Plaintiffs' theory is inconsistent with ERISA's purpose. Congress enacted ERISA to

---

[3] *See also Hutchins v. HP Inc.*, 767 F. Supp. 3d 912, 924 (N.D. Cal. 2025) ("*Hutchins II*"), *appeal filed*, No. 25-826 (9th Cir. Feb. 7, 2025); *Fumich v. Novo Nordisk Inc.*, 2025 WL 2399134 (D.N.J. Aug. 19, 2025); *Middleton v. Amentum Parent Holdings, LLC*, 2025 WL 2229959, at *14 (D. Kan. Aug. 5, 2025); *Cain v. Siemens Corp.*, 2025 WL 2172684, at *1 (D.N.J. July 31, 2025), *appeal filed*, No. 25-02564 (3d Cir. Aug. 19, 2025); *Wright v. JPMorgan Chase & Co.*, 2025 WL 1683642, at *3 (C.D. Cal. June 13, 2025), *appeal pending*, No. 25-4235 (9th Cir. July 9, 2025); *Madrigal v. Kaiser Found. Health Plan, Inc.*, 2025 WL 1299002, at *5 (C.D. Cal. May 2, 2025); *Barragan v. Honeywell Int'l Inc.*, 2024 WL 5165330, at *5 (D.N.J. Dec. 19, 2024) ("*Barragan I*"); *Barragan v. Honeywell Int'l Inc.*, 2025 WL 2383652 (D.N.J. Aug. 18, 2025) ("*Barragan II*"), *appeal filed*, No. 25-2609 (3d Cir. Aug. 22, 2025); *Dimou v. Thermo Fisher Sci. Inc.*, 2024 WL 4508450, at *9 (S.D. Cal. Sept. 19, 2024); *Nykiel v. Smith & Nephew, Inc.*, 2025 WL 2347549 (D. Mass. July 11, 2025), *R. & R. adopted*, 2025 WL 2347430 (D. Mass. Aug. 13, 2025); Order, *Cano v. The Home Depot, Inc.*, 1:24-cv-03793-TRJ (N.D. Ga. Aug. 26, 2025), ECF No. 34.

3

ensure retiring employees receive the benefits their employers promise them. *See, e.g., Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999). Congress did *not* legislate what those benefits must be, nor did it mandate how to pay the costs of administering a plan, leaving such corporate decisions to the employer responsible for establishing the plan. Plaintiffs do not claim that the Plan promised benefits that participants did not receive—on the contrary, there is no dispute that Plaintiffs and other participants received all benefits promised to them.

**Second,** Plaintiffs' theory contradicts settled law under ERISA and longstanding federal regulations dating back to 1963 that *require* that 401(k) retirement plans use forfeitures in the same way the Plan does. *See* 26 C.F.R. § 1.401-7(a) (forfeitures "must be used as soon as possible to reduce the employer's contributions under the plan").

**Third,** the Plan sponsor is entitled to decide what level of benefits it will provide, how to fund them, and which Plan costs it will bear or assess to participants. *See Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511 (1981). These "settlor" decisions are not made in a fiduciary capacity and, therefore, are not subject to ERISA's fiduciary provisions.

**Fourth,** even if the Court accepts Plaintiffs' theory that these decisions are subject to ERISA's fiduciary provisions, the SAC alleges nothing that would constitute a fiduciary breach. Plaintiffs' claims "seek to stretch the fiduciary duties of loyalty and prudence beyond what ERISA requires," *Wright*, 2025 WL 1683642, at *5, by mandating that SAS always use Plan forfeitures to pay Plan expenses unless the Company is unable to satisfy its contribution obligations. But neither ERISA nor the Plan authorizes SAS "to provide Plan participants with more benefits than the Plan documents set out." *Hutchins II*, 767 F. Supp. 3d at 925; *Naylor*, 2024 WL 4112322, at *6.

**Fifth,** the SAC fails to plausibly allege SAS violated ERISA's anti-inurement provision by using forfeitures to pay benefits to Plan participants. When a plaintiff "do[es] not allege that [the

defendant] used any of the assets for a purpose other than to pay its obligations to the Plan's beneficiaries, [the defendant] could not have violated the anti-inurement provision." *Hughes Aircraft*, 525 U.S. at 443.

**Finally,** the Court should dismiss Plaintiffs' failure-to-monitor claim in Count IV because it is derivative of, and falls with, Counts I-III.

## II. FACTUAL BACKGROUND[4]

### A. The Plan.

The Plan is a participant-directed, defined contribution plan under ERISA. SAC ¶ 44. This means participants can design their own individualized portfolio from a menu of investment options. *Id.* ¶¶ 44-45. The assets of the Plan are held in a Trust that is separate from SAS' assets and managed by Fidelity Investments. *Id.* ¶ 145; Ex. 1, 2023 Plan, §§ 1.47, 1.48, 3.12, 3.13, 5.01; Ex. 2, 2011 Plan, §§ 1.45, 1.46, 3.11, 3.12, 5.01. SAS' Board delegated authority to the Committee as the Plan Administrator, which in turn is responsible for selecting and monitoring the Plan's investment options. SAC ¶¶ 187-188; Ex. 1, 2023 Plan, §§ 13.01-13.03; Ex 2, 2011 Plan, §§ 13.01-13.03. As the SAC acknowledges, the Committee also engaged an outside investment consultant, Aon Investments, to assist it in overseeing Plan investments. *Id.* ¶ 76.

---

[4] This summary is based on the SAC and public documents cited therein. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (court may consider documents "attached or incorporated into the complaint."); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016) (court may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity"). Here, the SAC relies on the Plan document (SAC ¶ 57), summary plan description ("SPD") (*id.* ¶¶ 44-56), Form 5500 filings (*id.* ¶ 26), IPS (*id.* ¶ 27), and publicly available investment reports and performance data (*id.* ¶¶ 88-144). Courts routinely consider similar documents in resolving motions to dismiss ERISA claims. *See, e.g.*, *CommonSpirit*, 37 F.4th at 1168 (district court properly considered fund-related data "because it was central to [plaintiff's claim], publicly available, and judicially noticeable"); *Meiners*, 898 F.3d at 823 (similar); Order at 4. Should the Court find that it cannot consider a particular document at this stage, Defendants respectfully ask that the Court exclude such document, rather than convert this into a motion for summary judgment.

Throughout the putative class period, the Plan's investment options have spanned the risk/reward spectrum and various asset categories (*e.g.*, bonds, U.S. stocks, and international equities). The Plan offers a mix of actively managed funds and index funds, the JPM TDFs, and a stable-value fund. *See* Ex. 3, 2022 Form 5500, at Sched. H, line 4i (PDF p. 37). The Plan offers most of these options—including the JPM TDFs—as collective investment trusts ("CITs"), a low-cost investment vehicle available only to certain qualified plans. *Id.*; *see also* SAC ¶ 18.

**B.      The JPM TDFs.**

As the SAC explains, TDFs "are designed to provide a single diversified investment vehicle for plan participants" who prefer a simpler way to invest for retirement. SAC ¶ 17. TDFs invest in an underlying portfolio that gradually rebalances toward a more conservative asset allocation as the selected "target" retirement year approaches. *Id.* Like most TDF series, the Plan offers multiple "vintages" of the JPM TDFs, which cover each five-year period from 2020 through 2060, as well as a "Retirement" vintage. *Id*. ¶¶ 15-21; Ex. 3, 2022 Form 5500 at PDF p. 37.

A TDF's initial asset allocation—when the retirement date is decades away—consists primarily of equity investments, which have greater potential for returns and growth but also can carry greater risk. *See, e.g.*, Ex. 4, *Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries* (U.S. Dept. of Labor, Feb. 2013). As the target date approaches (and sometimes continuing after retirement), the asset allocation "de-risks" to a greater proportion of conservative, less volatile investments such as bonds. *Id*. This ongoing shift in asset allocation over time is called the fund's "glide path." *Id.* The JPM TDFs use a "to retirement" glide path, meaning they reach their most conservative asset allocation *at* the designated retirement date (e.g., 2050).

Different TDF managers also use materially different strategies for a fund's underlying investments. For example, according to Morningstar—which Plaintiffs cite as an authority (SAC ¶¶ 92, 98)—the managers of the JPM TDFs "mix it up on the equity side," using passively

6

managed index funds in asset categories where it is more difficult for active managers to outperform the market, while using "active emerging-markets equity managers, an asset class where cheap active funds have had solid odds of success over the last decade." *See* Ex. 6, *Morningstar 2021 Target-Date Strategy Landscape* ("2021 Morningstar Rpt.") at 26.

### C. Plaintiffs' Comparator TDFs.

The SAC abandons the six comparator TDFs from the previous complaint and replaces them with four completely different funds: (1) the Callan GlidePath Fund, (2) the Fidelity Freedom Blend Comingled Pools, (3) the T. Rowe Price Retirement Hybrid Trust, and (4) the Vanguard Target Retirement [*sic*] Trust. SAC. ¶ 93.

The SAC confirms that the JPM TDFs are meaningfully different from the comparators. Unlike the JPM TDFs, which use a "to retirement" strategy, all of Plaintiffs' comparators use a "through retirement" strategy, meaning they continue to de-risk years or even decades *after* the target date. SAC ¶ 111. The SAC also identifies two "benchmarks" for the JPM TDFs used in public investment literature: the S&P Target Date Index ("S&P Index") and a Composite Benchmark. SAC ¶ 88 (citing JPMCB SmartRetirement Passive Blend 2055 Fund Fact Sheet (June 30, 2025).[5] The S&P Index, however, is not an investable fund, but rather a composite index based on the average returns of the hundreds of different TDFs within a broader category—meaning it includes TDFs with "to," "through," active, passive, and "blend" or "hybrid" strategies. *Hall*, 2023 WL 2333304, at *7 (rejecting comparison of BlackRock TDFs to the S&P Index because "the S&P Index is not an actual fund"); *Tullgren*, 2023 WL 2307615, at *7 (same).[6]

---

[5] *Available at* https://am.jpmorgan.com/content/dam/jpm-am-aem/americas/us/en/literature/fact-sheet/commingled/asset-allocation/FS-CFPB-SR2055-CF-B.PDF (last visited Sept. 3, 2025).

[6] *Accord Bracalente v. Cisco Sys.*, 2024 WL 2274523, at *6 (N.D. Cal. May 20, 2024) ("*Bracalente II*") (S&P Index was not a meaningful benchmark for challenged TDFs); *Partida v. Schenker, Inc.*, 2024 WL 1354432, at *8 (N.D. Cal. Mar. 29, 2024) ("*Partida I*") ("the benchmarks [plaintiff] selected were passively managed market indexes. . . which are not meaningful benchmarks to the actively managed funds at issue

7

### D. Plan Contributions and Forfeitures.

The Plan allows SAS employees to save for retirement through their own pre-tax contributions and SAS' generous matching contributions, whereby SAS will make a safe harbor matching contribution equal to 100% of salary deferrals that does not exceed the first 6% of eligible compensation. SAC ¶¶ 47-49. Participants are always fully vested in their own contributions and the safe harbor matching contribution. Those contributions are not subject to forfeiture, nor are they part of Plaintiffs' claims. *Id.* ¶ 54. On the other hand, SAS' *discretionary* contributions are subject to a vesting schedule whereby participants gradually vest in the contributions over five years. *Id.* ¶ 55; Ex. 1, 2023 Plan, § 6.01; Ex. 2, 2011 Plan, § 6.01. Participants who terminate employment before fully vesting forfeit any unvested discretionary contributions. *Id.* ¶ 56; Ex. 1, 2023 Plan, §§ 6.01-6.02; Ex. 2, 2011 Plan, §§ 6.01-6.02. Those are the assets Plaintiffs allege must be used to increase benefits for active Plan participants.

Every 401(k) plan requires various administrative services and, therefore, incurs associated costs. These include recordkeeping, accounting, legal, and trustee services.[7] The employer[8] may volunteer to bear all or some of these costs, or the costs may be—and most commonly are— charged against the assets of the plan's trust and allocated to its participants.[9] DOL regulations

---

here"); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1149 (N.D. Cal. 2022) ("*Anderson I*") (S&P Target Date Index was not a meaningful benchmark for plan's TDFs despite allegations that it was a "common benchmark").

[7] *See, e.g.*, Dep't of Labor, *A Look at 401(k) Plan Fees*, at 3 (Sept. 2019), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf (last visited Sept. 3, 2025).

[8] The Plan defines "Employer" as "the Plan Sponsor," which it in turn defines as "SAS Institute Inc." Ex. 1, 2023 Plan, §§ 1.16, 1.37; Ex. 2, 2011 Plan, §§ 1.16, 1.37.

[9] *See* Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 2 ("[A]dministrative costs . . . may be borne, in whole or in part, by the employer or charged directly against the assets of the plan"), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/retirement-plan-fees-expenses.pdf (last visited Sept. 3, 2025).

require a plan's administrator to disclose to plan participants any administrative fees that "may be charged against the individual accounts of participants[.]" 29 C.F.R. § 2550.404a-5(c)(2).[10]

Here, Section 12.03 of the Plan expressly states that "[a]ll administrative expenses of the Plan . . . will be paid from the Trust, in accordance with the requirements of ERISA, except to the extent that the Employer elects to pay such expenses outside of the Trust." SAC ¶ 147; Ex. 1, 2023 Plan, § 12.03; Ex. 2, 2011 Plan, § 12.03. This means that unless SAS, as the employer, elects to pay Plan-related expenses, they will be paid by Plan participants.

The Plan states that "Forfeitures will be used to reduce the Employer Contribution for the Plan Year following the Plan Year in which such Forfeiture occurs . . . or may be applied by the Plan Administrator to pay the expenses of the Plan that may [] permissibly be paid with Plan assets in accordance with ERISA." Ex. 1, 2023 Plan, § 4.01(d)(ii); Ex. 2, 2011 Plan, § 4.01(d)(ii). The SAC alleges SAS used forfeitures both to pay Plan administrative expenses and to reduce SAS' employer contributions. SAC ¶ 159. On one hand, Plaintiffs allege SAS used forfeitures to pay a total of $222,320 in Plan-related expenses between 2018 and 2023. *Id.* On the other hand, Plaintiffs allege SAS used forfeitures to offset its employer contributions to the Plan by over $4 million during the same 6-year period. *Id.* Plaintiffs claim the latter use of forfeitures was unlawful and that ERISA requires SAS to use forfeitures *only* to pay Plan expenses unless the Company cannot meet its financial obligations—even though, as explained above, ERISA and the Plan permit charging administrative expenses to participants. *Supra* at 8-9. Notably, Plaintiffs do *not* allege that SAS contributed any less to their accounts than the Plan called for. Rather, Plaintiffs claim that if SAS always used forfeitures to pay Plan expenses, the balance of their accounts would be

---

[10] *See also* Dep't of Labor, Fact Sheet: *Final Rule to Improve Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans*, at 1-2 (Feb. 2012), *available at* https://www.dol.gov/newsroom/releases/ebsa/ebsa20101014-0 (last visited Sept. 3, 2025).

9

higher because they would have received free (or highly subsidized) administrative services paid for by SAS, rather than paying some of those expenses from their Plan accounts. SAC ¶¶ 151-162.

### E. Plaintiffs' Claims

The SAC asserts four claims. Plaintiffs first claim SAS breached ERISA's fiduciary duties of prudence (Count I) and loyalty (Count II), 29 U.S.C. §§ 1104(a)(1)(A)-(B). SAC ¶¶ 163-179. Count III claims SAS violated ERISA's "anti-inurement" provision, 29 U.S.C. § 1103(c)(1), by using forfeitures to "benefit" itself. SAC ¶¶ 180-185. Finally, Plaintiffs claim SAS and the Board failed to monitor the Committee as fiduciaries of the Plan in Count IV. *Id.* ¶¶ 186-192. For the reasons detailed below, each of these assertions fails to state a plausible claim.

## III. ARGUMENT

### A. The Court Should Dismiss Plaintiffs' Imprudence Claim.

#### 1. *ERISA Does Not Provide a Cause of Action for Plaintiffs Alleging Underperforming Investments.*

Plaintiffs' imprudence claim fails because it rests entirely on the allegation that SAS did not select a TDF suite that generated market-leading returns. The Court already rejected this theory because underperformance allegations, "without more, cannot support a breach of prudence claim." Order at 9 (collecting cases). Nothing in ERISA requires selecting "the best performing fund." *Meiners*, 898 F.3d at 823. Accordingly, "[i]t is uniformly recognized imprudence cannot be inferred based solely on allegations identifying the existence of . . . better performing alternative funds." *Matney*, 80 F.4th at 1154 n.15 (collecting cases).[11] Thus, "federal courts have widely and consistently rejected attempts to impose ERISA liability where the claims are based solely on a

---

[11] *See also Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020) (affirming dismissal despite "no question" that one fund "performed more poorly than [comparators] over certain periods of time"); *Meiners*, 898 F.3d at 822-23 ("[T]hat one fund with a different investment strategy ultimately performed better does not establish anything about whether the Wells Fargo TDFs were an imprudent choice.").

fund's underperformance." *Phillips v. Cobham Advanced Elec. Sol's, Inc.*, 2024 WL 3228097, at *8 (N.D. Cal. June 28, 2024) ("*Phillips I*"); *see also Collins*, 2025 WL 2383710, at *2 (Plaintiffs may not . . . rely only on after-the-fact allegations that . . . a better alternative was available at the time of the challenged decisions"); *Matney*, 80 F.4th at 1154 n.15 (similar); *CommonSpirit*, 37 F.4th at 1166; *White I*, 2017 WL 2352137, at *20; *Partida II*, 2025 WL 948123, at *2.

This formulation makes sense. Prudent fiduciaries should *not* focus solely on past performance, but rather must consider how an investment is expected to perform in the future (among other factors). *See, e.g.*, *Kendall*, 2021 WL 1231415, at *3. This is consistent with the Supreme Court's guidance that courts must give due regard to "the range of reasonable judgments a fiduciary may make." *Hughes*, 595 U.S. at 177. Adopting an "underperformance-only" theory of liability would "flatten this nuanced prudence evaluation into a one-dimensional comparison" that considers only performance data. *Bracalente v. Cisco Sys., Inc.*, 2023 WL 5184138, at *4 (N.D. Cal. Aug. 11, 2023) ("*Bracalente I*"). Plaintiffs' theory would subject every fiduciary to an impossible standard: select the best-performing fund or face potential liability. But in every set of investments, one investment will always have the lowest performance over any period, and about half will have below-average performance, even if they are all prudent choices. Thus, "the weight of authority [holds] ERISA claims based solely on allegations of underperformance insufficient." *Bracalente II*, 2024 WL 2274523, at *11.

The SAC does nothing to fix this fatal flaw. Once again, Plaintiffs' only factual basis for their imprudence claim is their allegation that in hindsight the JPM TDFs "underperformed" a few handpicked TDFs. *See* SAC ¶¶ 8, 166. That is precisely the theory this Court rejected when it concluded that "[c]ourts must not second-guess a fiduciary's prudence with the benefit of hindsight" based on allegations about "the decrease in the relevant investment's price." Order at 6

(quoting *Pension Benefits Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013)). Instead, the Court held ERISA requires a court to "evaluate the contested investments and processes in relation to the whole retirement plan." Order at 8. Here, the only investment Plaintiffs challenge is the suite of JPM TDFs.

The SAC does not include any allegations to show that offering the JPM TDFs fell outside the "range of reasonable judgments" that other plan fiduciaries make. *See* SAC generally. Nor could it. There is ample contemporaneous public information demonstrating the market's positive assessment of the JPM TDFs. For example, Morningstar—a source the SAC cites (SAC ¶¶ 92, 98)—awarded the JPM TDFs its highest "Gold" rating in both 2020 and 2021. Ex. 5, 2020 Morningstar Rpt. at 24; Ex. 6, 2021 Morningstar Rpt. at 10. Moreover, in 2021 the JPM TDFs were one of only two TDF suites that use a "blend" strategy to receive a "Gold" rating. Ex. 6, 2021 Morningstar Rpt. at 26. The JPM TDFs also received "high" or "above average" ratings for the People, Process, and Parent "pillars" underlying Morningstar's overall ratings. *Id.* at 10. The Morningstar Report also explains that in 2020, the JPM TDFs ranked in the "top 10" among TDFs for net inflows (*i.e.*, new investment), further reporting that the JPM TDFs had *$41 billion* in assets in 2021 (in both mutual funds and CITs). *Id.* at 8, 24. Indeed, the 2055 JPM TDF alone had ***$4.62 billion*** in assets under management according to the June 30, 2025, fact sheet cited in the SAC. SAC ¶ 88 n.11. If investors vote with their money, then they have cast their ballots in favor of the JPM TDFs. At a minimum, this shows other "prudent investors under similar circumstances" deem the JPM TDFs well within the "range of reasonable" investments. *See Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022); 29 U.S.C. § 1104(a)(1)(B).

Plaintiffs purport to offer "other factors" demonstrating the JPM TDFs are unreasonable investments (SAC ¶¶ 133-44), but these allegations are just more of the same. Instead of providing

12

additional indicia of imprudence, as this Court held was necessary to state a claim, Plaintiffs allege only that the JPM TDFs "consistently failed to meet their benchmarks and produced deficient returns," *id.* ¶ 134, and that the IPS required SAS to remove the funds due to this alleged poor performance, *id.* ¶¶ 139-141. The Court already held these allegations are insufficient because they "repackage[] [Plaintiffs'] deficient underperformance argument." Order at 10-11. Plaintiffs' attempt to pass off yet more underperformance allegations as something else gives up the game: they have not stated (and cannot state) an imprudence claim.

### 2. The JPM TDFs Did Not Perform Poorly, Even on Plaintiffs' Terms.

This Court also held that even if allegations of comparative investment performance could support an ERISA imprudence claim, Plaintiffs "failed to plausibly allege[] underperformance" in the first place. Order at 9-10. The Court noted "[t]he JPM funds generally provided returns within one-to-two percentage points of plaintiffs' handpicked comparator funds[,]" while "Plaintiffs' own graphs show that the JPM funds kept pace with, and occasionally outperformed, the Morningstar Lifetime Mod Index benchmark based on three-year and five-year rolling returns." *Id.* The Court concluded that "[s]uch alleged underperformance—between one and four percent of a benchmark—fails to state a plausible ERISA claim" as a matter of law. *Id.*

The SAC does not cure this critical pleading failure either. Plaintiffs again allege the same modest deviations between the performance of the JPM TDFs and Plaintiffs' chosen comparators. For example, Paragraph 115 shows the JPM TDFs typically were no more than 1% to 2% (and often less) below their chosen comparators before the start of the relevant period. SAC ¶ 115. Paragraph 117 shows similar performance during the relevant period. *Id.* ¶ 117. In all instances, Plaintiffs allege the JPM TDFs' performance was within 3% of the comparators. *Id.* ¶¶ 115, 117. As the Court held, mere allegations of investment underperformance such as these do not support an ERISA imprudence claim as a matter of law. Order at 9-10.

13

Plaintiffs try to disguise this pleading defect by restating the *absolute* performance differentials between the JPM TDFs and their comparators as *relative* percentages. For example, they allege the 2020 JPM TDF's annualized three-year returns from 2018 through 2020 were 6.65%, while the 2020 Vanguard TDF's returns over the same period were 8.14%—an *absolute* difference of 1.49%. SAC ¶ 117. To create the appearance of a greater differential (one exceeding the 1% to 4% delta this Court deemed insufficient to sustain an imprudence claim), Plaintiffs then allege a 22.41% *relative* difference between the two TDFs. *Id.* But Plaintiffs' inventive pleading tactics cannot change the fact that the absolute performance differential between these two funds, as alleged in the same paragraph of the SAC, is just 1.49%. SAC ¶ 117. *See* Order at 9-10 (alleged underperformance of 1%-3% insufficient to state imprudence claim).[12]

### 3. The Comparator TDFs Are Not Meaningful Benchmarks.

Finally, Plaintiffs' challenge to the JPM TDFs fails because they again do not plausibly allege a "meaningful benchmark." In dismissing Plaintiffs' imprudence claim, the Court noted that "[t]o show an inference that a prudent fiduciary in like circumstances would have made a different decision, plaintiffs must provide a 'meaningful benchmark'" for the challenged investment. Order at 7 (quoting *Meiners*, 899 F.3d at 822). The Court further noted that this is a "challenging pleading standard." *Id.* That is because offering a meaningful benchmark requires more than declaring that two funds are "similar" or identifying other funds with "some similarities." *Meiners*, 898 F.3d at 823. Rather, this pleading standard demands that Plaintiffs allege facts sufficient to show a "like-for-like comparison." *Matousek*, 51 F.4th at 279-80. As the Ninth Circuit held in affirming dismissal of similar claims challenging a suite of TDFs, "truly comparable" investments cannot

---

[12] *Kendall*, 2021 WL 1231415, at *9 (similar); *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 163 (E.D.N.Y. 2022) (similar); *Evans v. Assoc. Banc-Corp.*, 2022 WL 4638092, at *7 (E.D. Wis. Sept. 30, 2022); *Cho v. Prudential Ins. Co. of Am.*, 2021 WL 4438186, at *9 (D.N.J. Sept. 27, 2021) (similar); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019).

have "different aims, different risks, and different potential rewards," and "simply labeling funds as 'comparable' or 'a peer' is insufficient to establish that those funds are meaningful benchmarks." *Anderson II*, 137 F.4th at 1023 (cleaned up; citations omitted).

Plaintiffs fail to meet this standard. To start, the JPM TDFs use a "to retirement" strategy, whereas all the comparator TDFs use a "through retirement" strategy. *Supra* at 6-7. The DOL highlights this as an "important" difference, *id.*, and it alone makes the comparator TDFs inapt benchmarks for the JPM TDFs, because they "hav[e] materially different investment strategies." *Matney*, 80 F.4th at 1154 n.14 (affirming dismissal where plan's TDFs used a "to retirement" strategy, whereas the comparator TDFs used a "through" glidepath); *CommonSpirit*, 37 F.4th at 1167 (TDFs with "distinct goals and distinct strategies" are "inapt comparators"); *Hall*, 2023 WL 2333304, at *6 (similar); *Tullgren*, 2023 WL 2307615, at *6 (similar); *Luckett v. Wintrust Fin. Corp.*, 2024 WL 3823175, at *3 (N.D. Ill. Aug. 14, 2024) (similar); *Abel v. CMFG Life Ins. Co.*, 2024 WL 307489, at *5 (W.D. Wis. Jan. 26, 2024) (similar); *Phillips v. Cobham Advanced Elec. Sols., Inc.*, No. 23-cv-03785-EKL (N.D. Cal. Mar. 21, 2025), ECF No. 75, at 3 ("*Phillips II*") (similar); *Bracalente II*, 2024 WL 2274523, at *8 (similar).

Plaintiffs argue "it does not matter whether the [JPM TDFs] and Comparator Funds have the same glide paths" because the IPS does not mandate the use of benchmarks using a "to retirement" strategy. SAC ¶ 110. This misses the point and contradicts the authority above. The allegation that the JPM TDFs generated positive-but-lower returns than comparators that employed different glide paths cannot permit the inference that the JPM TDFs were imprudent; it means only that they performed *differently* than TDFs with *different* investment strategies and *different* objectives. *See Matney*, 80 F.4th at 1154 n.14. Comparing the raw returns of funds with different goals says nothing about whether a fund falls outside the "range of reasonable" investments, let

15

alone allow an inference that the fiduciary process was flawed. *Hughes*, 595 U.S. at 177; *Meiners*, 898 F.3d at 822-23 ("that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice.").

The SAC also shows that the JPM TDFs and comparators have different asset allocations and holdings.[13] For example, the 2045 JPM TDF invests in more stock (85%)[14] than the 2045 Vanguard TDF (78.9%),[15] but less stock than the 2045 T. Rowe Price TDF (93.2%).[16] And there are meaningful differences *within* the stock allocations held by each fund. The 2045 JPM TDF holds 66.8% domestic equity, while the 2045 Fidelity TDF holds only 56.9% domestic equity.[17] The 2045 JPM TDF allocates 6.1% to real-estate securities (REITs), but the 2045 Fidelity TDF and 2045 Vanguard TDF hold *no* real estate investments.[18] The funds' bond allocations are just as varied: the 2045 JPM TDF allocates 11.4% of its investments to bonds, but the Vanguard TDF allocates 16.1% and the T. Rowe TDF allocates only 3.5%. SAC ¶ 97. Details such as these are critical in understanding how the JPM TDFs and comparator TDFs compare and why their performance may differ.[19] The SAC glosses over all of them.

Finally, Plaintiffs cite the S&P Index, which they declare is an appropriate comparator because JPMorgan has identified it as one of two benchmarks for the JPM TDFs. SAC ¶ 88. But

---

[13] The SAC cites publicly available investment data for the JPM TDFs and the proposed comparators. SAC ¶ 97 nn.13-17. SAS relies on the same data described in those sources.

[14] https://markets.businessinsider.com/funds/jpmcb-smartretirement-passive-blend-2045-cf-us2029191481.

[15] https://markets.businessinsider.com/funds/vanguard-target-retirement-2045-trust-us92214t1051.

[16] https://markets.businessinsider.com/funds/t-rowe-price-retirement-hybrid-2045-trust-class-t14-us87283j5902.

[17] https://markets.businessinsider.com/funds/fidelity-freedom-blend-2045-cmgld-pool-t-us30257r5789.

[18] *Id.*; https://markets.businessinsider.com/funds/vanguard-target-retirement-2045-trust-us92214t1051.

[19] *See, e.g.*, *Meiners*, 898 F.3d at 823 & n.2 (finding Vanguard TDFs were not a proper comparator for Wells Fargo TDFs in part due to different allocations to bonds); *Matousek*, 51 F.4th at 282 (one fund's focus on "value" made it an inapt comparator for another focused on "growth").

16

that does not change the fact that courts routinely find that broad market indices like this are not meaningful benchmarks because they are not investible funds, do not share the "same overall purpose and strategy," and reflect only the aggregate performance of myriad different investments and strategies. *In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *9 (N.D. Cal. Nov. 16, 2021) (dismissing claim based on comparison to index); *see also Hall*, 2023 WL 2333304, at *7 (rejecting comparison of BlackRock TDFs to the S&P Index, because "the S&P Index is not an actual fund"); *Tullgren*, 2023 WL 2307615, at *7 (same); *Partida I*, 2024 WL 1354432, at *8 (same); *Anderson I*, 579 F. Supp. 3d at 1149 (same).

**B.** **The Court Should Dismiss Plaintiffs' Forfeiture Claims.**

***1.*** ***ERISA Does Not Require Increasing Plaintiffs' Benefits Under the Plan.***

Plaintiffs' theory that SAS was required to pay administrative expenses via forfeitures contradicts fundamental ERISA principles because it seeks to impose a benefit the Plan itself does not provide. Congress enacted ERISA to ensure employees receive their promised benefits; it did not legislate what those benefits must be or require employers to provide employees with *additional* benefits beyond those contemplated in the plan document. *See, e.g.*, *Hughes Aircraft*, 525 U.S. at 446 (ERISA "is concerned with 'ensur[ing] that employees will not be left emptyhanded once employers have guaranteed them certain benefits,' not with depriving employers of benefits incidental thereto.") (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)); *Dzinglski v. Weirton Steel Corp.*, 875 F.2d 1075, 1078 (4th Cir. 1989) ("The judicial role is not to rewrite plan provisions, but to assure that they are fairly administered.").

When assessing claims like Plaintiffs', the plan document defines the parties' rights and obligations. *See, e.g.*, *Curtiss-Wright v. Schoonejongen*, 514 U.S. 73, 83 (1995). Thus, "ERISA requires the Plan be administered as written and to do otherwise violates not only the terms of the Plan but causes the Plan to be in violation of ERISA." *Gagliano v. Reliance Standard Life Ins.*

17

*Co.*, 547 F.3d 230, 239 (4th Cir. 2008). The duty to comply with a plan is fulfilled "where the fiduciary ensures that participants have received their promised benefits." *Hutchins II*, 767 F. Supp. 3d at 924; *see also Spink*, 517 U.S. at 887. The threshold question, therefore, is whether Plaintiffs received the benefits the Plan promised them. The answer here is a resounding yes.

As was true in *Wright* (and other forfeiture cases), "there is no allegation that Plaintiff[s] or any Plan participant did not receive the benefits they were promised under the terms of the Plan." 2025 WL 1683642, at *5 (dismissing similar claims). Nor do Plaintiffs allege SAS violated the Plan's terms by contributing less than it should have, or that it failed to fund the Plan sufficiently to provide all benefits due. Nor could they make such allegations: the Plan expressly authorizes SAS to allocate forfeitures toward providing benefits to participants. Ex. 1, 2023 Plan, § 4.01(d)(ii); Ex. 2, 2011 Plan, § 4.01(d)(ii). Instead, Plaintiffs claim SAS should be forced to give them an even *greater* benefit than the Plan provides either by using forfeitures to pay costs the Plan imposes on participants or by forcing SAS to increase its contributions to the Plan.

This theory is inconsistent with ERISA, as well as Supreme Court and Fourth Circuit precedent. *See Gagliano*, 547 F.3d at 239; *Dzinglski*, 875 F.2d, at 1078; *Naylor*, 2024 WL 4112322, at *6. The Supreme Court determined that because ERISA's purpose is to protect "contractually defined benefits" and to assure reliance on the "written plan documents," claims that rely on the premise that ERISA plan participants are entitled to benefits beyond those explicitly laid out in the subject plan are doomed to fail. *See U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 100-01 (2013) (citations omitted). In other words, "ERISA does not create an exclusive duty to maximize pecuniary benefits." *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004) (citation omitted). This principle applies to the payment of a plan's administrative expenses. Nothing in ERISA requires an employer like SAS to pay such expenses—which would

18

be contrary to the terms of the Plan itself. *Barragan II*, 2025 WL 2383652, at *3 (plaintiff seeks to impose a "new mandate" that "would result in an override" of plan provisions). The Court should dismiss the SAC for this reason alone. *See Middleton*, 2025 WL 2229959, at *14-15 (dismissing claim because "Plaintiffs impermissibly seek to create a new benefit"); *Madrigal*, 2025 WL 1299002, at *5 (complaint did not allege "Plaintiff failed to receive any benefits that she was contractually owed."); *Hutchins v. HP Inc.*, 737 F. Supp. 3d 851, 863 (N.D. Cal. 2024) ("*Hutchins I*") (similar); DOL Br. at 17-18 (agreeing with *Hutchins*).

### 2. Plaintiffs' Claims Are Foreclosed by Decades of Settled Law That Permits Using Forfeitures to Provide Benefits to Other Plan Participants.

As the DOL confirmed, "[t]he established understanding for . . . decades has been that defined contribution plans . . . may allocate forfeited employer contributions to pay benefits for remaining participants rather than using those funds to defray administrative expenses." DOL Br. at 1. This historical backdrop explains why the majority of courts have held that Plaintiffs' theory of liability "ignore[s] decades of settled law" and "is implausible in light of the long history of using forfeitures to reduce employer contributions." *Hutchins II*, 767 F. Supp. 3d at 922-23; *see also Wright*, 2025 WL 1683642, at *4 ("Plaintiff's theory [] fails because it contravenes ERISA and decades of settled precedent."). The law has always recognized what is really just common sense: forfeited contributions are still employer contributions, made at a prior time but no longer allocated or belonging to any individual plan participant. There is nothing nefarious or improper about allowing such forfeitures to be used to fund other benefits called for by the plan's terms.

Like all tax-qualified retirement plans, the Plan must comply with numerous requirements in the Tax Code. *See* Internal Revenue Code, 26 U.S.C. §§ 1-9834. Adherence to those "qualification requirements" ensures both the deductibility of employer contributions and the tax deferral of employer and employee contributions (and earnings). *See id*. § 401. ERISA and the Tax

19

Code have always been inextricably intertwined; indeed, ERISA amended the Tax Code and is the source of many of its qualification requirements.[20] The Treasury Department, in turn, has promulgated many regulations with which an ERISA plan must comply to remain tax-qualified.

Like ERISA, the Tax Code also mandates that assets in a tax-qualified trust must not be "used for, or diverted to, purposes other than for the exclusive benefit of" the employees and beneficiaries for whom the trust is established. 26 U.S.C. § 401(a)(2); *see also* 26 C.F.R. § 1.401-2; *compare* 29 U.S.C. § 1103(c)(1) (using similar "exclusive purpose" language in Title I of ERISA). Therefore, a plan would not be tax-qualified under the Tax Code if it allowed for the possibility that "any part of the corpus or income [could] be . . . used for, or diverted to" some other purpose—such as benefiting the employer, as Plaintiffs allege here. 26 U.S.C. § 401(a)(2).

Notwithstanding the Tax Code's exclusive-benefit requirement, Treasury regulations have expressly authorized—since even before ERISA was enacted and continuing through the present—using forfeitures to reduce or offset future employer contributions. Specifically, 26 C.F.R. § 1.401-7(a) requires that forfeitures "must be used as soon as possible to *reduce the employer's contributions* under the plan." *Id*. (emphasis added); *see also* Rev. Ruling 67-68, 1967-1 C.B. 86.

Consistent with § 1.401-7(a), both the Treasury Department and Congress have made clear over the past six decades that a defined contribution plan may use forfeitures to provide benefits to other participants (thereby reducing future employer contributions). For example, the IRS issued informal guidance in 2010 advising that forfeitures "may be used to pay for a plan's administrative

---

[20] *See, e.g.*, Dep't of Labor, *History of EBSA and ERISA*, *available at* https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/history-of-ebsa-and-erisa (last visited Sept. 3, 2025) ("Title II of ERISA, which amended the Internal Revenue Code to parallel many of the Title I rules, is administered by the IRS."). For example, the Treasury Department has the authority to apply ERISA's vesting and other provisions. *See* Reorg. Plan No. 4 of 1978, 5 U.S.C. App. 1, 92 Stat. 3790; 29 U.S.C. § 1202(c). The Treasury Department also has enforcement authority over prohibited transactions. *See* 26 U.S.C. § 4975. Congress even required the Labor and Treasury Departments to coordinate in enforcing ERISA, to the extent the statutes overlap. *See* 29 U.S.C. § 1204(a).

expenses and/or to *reduce employer contributions*," also noting that "it may be appropriate to take the non-current-year forfeitures and *use them as employer contributions* for the current plan year." 2010 Newsletter of the Employee Plans Office of the IRS Tax Exempt & Govt. Entities Div., at 4-5 (Ret. News for Employers, Vol. 7, Spring 2010), *available at* https://www.irs.gov/pub/irspdf/p4278.pdf (emphases added). The Internal Revenue Manual also advises that forfeitures in a defined contribution plan may not "revert back to the plan sponsors," but rather "must be allocated to the remaining participants or used to reduce the employer contributions that are otherwise required under the plan." IRM § 7.12.1.9, *Forfeitures* (02-16-2017), 2007 WL 9649931, *available at* https://www.irs.gov/irm/part7/irm_07-012-001#idm 139730277532416.[21]

Congress has also confirmed the same understanding about using forfeitures as the Treasury Department. For example, the Tax Reform Act of 1986 amended 26 U.S.C. § 401(a)(8)—which prohibits using forfeitures to "increase the benefits any employee would otherwise receive"—to clarify that this prohibition applies to defined benefit plans. *See* Pub. L. No. 99-514, 100 Stat. 2085, § 1119(a) (1986). In explaining the bill, the House Conference Report made clear that under existing law, "forfeitures arising in any defined contribution plan can be either (1) reallocated to the accounts of other participants in a nondiscriminatory fashion, or (2) used to *reduce future employer contributions* or administrative costs." H.R. Rep. No. 99-841, Vol. II at 442 (1986) (emphasis added). Indeed, the Treasury Department recently recounted this history

---

[21] Other Treasury regulations confirm that forfeitures may be allocated to future employer contributions. For example, in 2018 the Treasury Department issued final regulations that expressly "permit forfeitures of prior contributions to be used to fund" qualified matching contributions ("QMACs") and qualified non-elective contributions ("QNECs"). 83 Fed. Reg. 34469, 34470 (July 20, 2018). Both are contributions an employer may make to satisfy nondiscrimination rules under the Tax Code. *See* IRS, *Issue Snapshot—Plan Forfeitures Used for Qualified Nonelective and Qualified Matching Contributions*, *available at* https://www.irs.gov/retirement-plans/issue-snapshot-plan-forfeitures-used-for-qualified-nonelective-and-qualified-matching-contributions (last visited Sept. 3, 2025). This regulation thus specifically allows using forfeitures to satisfy these employer contributions, which would be unlawful under Plaintiffs' reasoning.

21

when proposing new regulations, highlighting Congress's intent in 1986 to "provide[] uniform rules regarding the use of forfeitures under any defined contribution plan." 88 Fed. Reg. at 12283.

The Treasury Department's proposed new regulations clarify the permissible use of forfeitures in defined contribution plans. In doing so, it reaffirms the same understanding that both the Treasury Department and Congress have expressed for more than sixty years. *See Hutchins II*, 767 F. Supp. 3d at 923 (proposed regulation "[c]onsistent with changes made by [the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085], which provided uniform rules for the use of forfeitures in defined contribution plans.") (internal quotation marks omitted). This regulation requires a defined contribution plan to provide that forfeitures "will be used" for one or more of three lawful purposes: "(i) To pay plan administrative expenses; (ii) *To reduce employer contributions under the plan*; or (iii) To increase benefits in other participants' accounts in accordance with plan terms." 88 Fed. Reg. at 12285 (emphasis added). The proposed regulation, like the existing one, explicitly authorizes the very conduct Plaintiffs challenge.

To accept Plaintiffs' theory, therefore, would mean the Treasury Department continues to authorize a practice that simultaneously constitutes a violation of ERISA—and, for that matter, would also violate the similar "exclusive benefit" requirement in the Tax Code itself, *see* 26 U.S.C. § 401(a)(2). This is neither plausible nor reasonable, and "would be contrary [to] the settled understanding of Congress and the Treasury Department regarding defined contribution plans like the one at issue in this case." *Hutchins I*, 737 F. Supp. 3d at 862-63; *see also Sievert v. Knight-Swift Transp. Holdings, Inc.*, 780 F. Supp. 3d 870, 878 (D. Ariz. 2025) ("long-standing Treasury Department reports and regulations indicate that forfeitures in defined contribution plans may be used to reduce future employer contributions"); *Middleton*, 2025 WL 2229959, at *15 (similar); *Wright*, 2025 WL 1683642, at *4 (similar); *Dimou*, 2024 WL 4508450, at *9 (similar).

22

Indeed, *none* of the ERISA provisions Plaintiffs cite prohibit using forfeitures just as Treasury regulations have always allowed. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) (a statute's silence should be construed "as exactly that: silence"). Plaintiffs rely instead on generic concepts under ERISA's fiduciary and anti-inurement provisions. *See Hutchins II*, 767 F. Supp. 3d at 923 ("Plaintiff effectively asserts that the general fiduciary duty provision of ERISA abrogates these long-settled rules regarding the use of forfeitures in defined contribution plans."). It is implausible to suggest that the statutory provisions Plaintiffs rely on— provisions that do not even mention forfeitures—nevertheless prohibit using forfeitures exactly as longstanding regulations, legislative history, and other guidance allow. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261-62 (1993) ("vague notions of a statute's basic purpose are [] inadequate to overcome the words of its text," which is "especially true with legislation such as ERISA") (quotations omitted); *Christensen v. Harris County*, 529 U.S. 576, 585 (2000) (similar).

### 3. Plaintiffs' Claims Fail Because They Challenge Corporate Decisions SAS Made in a Settlor Capacity.

The "threshold question" for any alleged fiduciary breach or prohibited transaction under ERISA is whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000). An employer's decisions as to a plan's design and terms are corporate decisions made in a settlor capacity, not as a fiduciary. *See, e.g.*, *Hughes Aircraft*, 525 U.S. at 444 ("decision[s] regarding the form or structure of the [p]lan such as who is entitled to receive [p]lan benefits and in what amounts" are settlor functions).

In rejecting claims that an employer "should have paid [plan] expenses directly" and should have "contribute[d] more to the Plan," courts have made clear that "whether to cover these expenses is a question of plan design, not of administration." *Loomis v. Exelon Corp.*, 658 F.3d

667, 671 (7th Cir. 2011). Thus, "[w]hen deciding how much to contribute to a plan, employers may act in their own interests." *Id.*; *see also Greenbrier Hotel Corp. v. Unite Here Health*, 719 F. App'x 168, 180 (4th Cir. 2018) ("[A] plan sponsor does not become a fiduciary by performing settlor-type functions such as establishing a plan and designing its benefits.") (citation omitted); *cf. Moon v. BWX Techs., Inc.*, 577 F. App'x 224, 229 (4th Cir. 2014) ("Simply because an employer is an ERISA plan sponsor does not automatically convert the employer into a plan fiduciary.").This is inherent in the fundamental premise that ERISA does not require employers to offer benefit plans at all, much less provide any specific level of benefits. *See Spink*, 517 U.S. at 887. Instead, ERISA protects whatever commitment an employer makes, once made. *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985) (ERISA was enacted to "protect contractually defined benefits" based on the plan document).

This settled authority forecloses Plaintiffs' claims. SAS is the Plan sponsor, but it is *not* the Plan fiduciary under the terms of the Plan. *Supra* at 5, 8 n.8. Thus, SAS acts only in a settlor capacity in relation to the Plan, not a fiduciary one. To that end, Section 12.03 of the Plan states that "[a]ll administrative expenses of the Plan . . . will be paid from the Trust, in accordance with the requirements of ERISA, except to the extent that the Employer elects to pay such expenses outside of the Trust." SAC ¶ 147; Ex. 1, 2023 Plan, § 12.03; Ex. 2, 2011 Plan, § 12.03; DOL Br. at 14 (finding that similar provisions in HP's plan "make clear that the Plan sponsor, as settlor, is solely responsible for funding matching contributions and determining whether Plan expenses are paid by the sponsor or out of the Plan trust"). Thus, *unless* SAS volunteers to pay Plan-related expenses, those expenses will be paid by Plan participants. The Plan further provides that forfeitures will be used to pay the Plan's administrative expenses and/or to reduce SAS's matching contributions. Ex. 1, 2023 Plan, § 4.01(d)(ii); Ex. 2, 2011 Plan, § 4.01(d)(ii).

Examining similar plan provisions, the court in *Hutchins II* ruled that HP "*acting as settlor* determines whether, in a given year, Plan expenses will be paid by HP or charged to Plan participants' accounts." *Hutchins II*, 767 F. Supp. 3d at 922 (emphasis added). Therefore, "HP (as fiduciary) will only use those forfeitures to pay Plan expenses *if HP (as settlor) decided* that year that the Plan administrator should use at least some forfeitures to pay Plan expenses." *Id.* (emphasis added); *see also Naylor*, 2024 WL 4112322, at *7 ("To the extent that Defendant established the Plan terms, it did so in its capacity as a 'settlor,' which does not give rise to fiduciary duties under ERISA."). Plaintiffs ignore that distinction. What they really argue is that SAS should use forfeitures to give them a *greater* benefit than the Plan provides by paying Plan-related costs it did not agree to pay. This would directly impinge on SAS's right, as Plan sponsor, to make plan design decisions that are not subject to ERISA's fiduciary provisions. *See* DOL Br. at 17-18.

Plaintiffs' allegation that offsetting employer contributions might not violate ERISA so long as the Company were unable to meet its financial obligations (SAC ¶ 152) does not change anything. Instead, it only makes clear that Plaintiffs' theory really concerns settlor activity, not fiduciary decision-making. SAS does not need to contribute anything to the Plan; it could terminate the Plan tomorrow or eliminate employer contributions altogether, should it decide to do so as the Plan sponsor. Because the SAC challenges only non-fiduciary decisions, the Court should dismiss Plaintiffs' claims. *See, e.g.*, *Wright*, 360 F.3d at 1102 (the Supreme Court has "affirmed Rule 12(b)(6) dismissals of ERISA claims on the ground that the conduct of the defendant was not that of a 'fiduciary,' but rather a 'settlor'") (citing *Spink*, 517 U.S. 882); *Moon*, 577 F. App'x at 229.

### 4. The SAC Does Not Plausibly Allege Any Breach of Fiduciary Duty (Counts I and II).

Even if Plaintiffs challenged fiduciary conduct, Counts I and II would still fail because the SAC does not allege any breach of a fiduciary duty. *See Naylor*, 2024 WL 4112322, at *6

25

(dismissing similar fiduciary-breach claims); Order, *Steen*, No. 4:24-cv-03105-JD, ECF No. 38, at *10-11 (same). The alleged "breach" is only that SAS used forfeitures exactly as the Plan and long-settled law allow. There is no support in either the law or the Plan for finding that ERISA required SAS to use forfeitures in the way Plaintiffs would prefer. Fourth Circuit precedent makes clear that a fiduciary does not breach its ERISA duties by acting in compliance with the lawful terms of a plan document, and Plaintiffs have not alleged the Plan document itself contains any unlawful terms. *See Gagliano*, 547 F.3d at 239.

As one court explained, Plaintiffs' theory would require SAS to create an additional benefit (based on this strained interpretation of ERISA's fiduciary provisions) by using forfeitures to reduce administrative expenses otherwise payable by Plan participants. *See Hutchins II*, 767 F. Supp. 3d at 922. Thus, Plaintiffs seek to stretch ERISA's fiduciary duties beyond their limits, asserting that "the general fiduciary duty provision of ERISA abrogates [] long-settled rules regarding the use of forfeitures in defined contribution plans" and requires SAS to use forfeitures in a particular way. *Id.* at 923. Nothing in ERISA, the law, or the Plan requires that outcome. *See Barragan I*, 2024 WL 5165330, at *5 (dismissing similar claims based on *Hutchins'* reasoning); *Barragan II*, 2025 WL 2383652, at *4 (same); *Naylor*, 2024 WL 4112322, at *6 (same); *Bozzini v. Ferguson Enters. LLC*, 2025 WL 1547617, at *2 (N.D. Cal. May 29, 2025) (same); *Wright*, 2025 WL 1683642, at *5 (same); *Dimou*, 2024 WL 4508450, at *9 (same); *Madrigal*, 2025 WL 1299002, at *5 (same); *McWashington*, 2025 WL 1736765, at *15 (same); *Sievert*, 780 F. Supp. 3d at 876-78 (same); Order, *Cano*, 1:24-cv-03793-TRJ, ECF No. 34, at 5-13 (same).

Plaintiffs try to avoid this authority by alleging ERISA does not require SAS to pay administrative expenses in *every* instance, but only during periods when the Company is financially sound. *See* SAC ¶ 152. As noted above, this is a settlor decision. But even assuming

Plaintiffs challenge fiduciary decisions, their theory is no less overbroad or implausible than the one rejected in *Hutchins* and many other cases. As in those cases, Plaintiffs look to make SAS' *option* to pay for administrative expenses under the Plan a *duty* under ERISA. In other words, Plaintiffs still seek to impose a strict categorical limitation on SAS' decision-making. No authority recognizes so dramatic a limitation on an employer's ability to make decisions about how to spend its money or (once that money is put into a plan) how to allocate plan assets among participants. The Supreme Court has cautioned that in enacting ERISA, "Congress sought 'to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.'" *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (citation omitted). But Plaintiffs' theory would do exactly that.

Plaintiffs' loyalty and prudence claims in Counts I and II fail for additional reasons. ERISA's duty of loyalty requires that a fiduciary discharge his or her duties for the "exclusive purpose" of *both* "(i) providing benefits to participants and their beneficiaries," and "(ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Using forfeitures to offset employer contributions fulfills the duty of loyalty. It is clearly in the "interest" of any participant who receives reallocated contributions forfeited by other participants. *See id*. § 1002(34) (defining a participant's benefit as "based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any ***forfeitures of accounts of other participants*** which may be allocated to such participant's account") (emphasis added). And "the fact that reallocation of the forfeited amounts will reduce the amount that [SAS] contributes as matching contributions in the future does not make" the process illegal. *Hutchins I,* 737 F. Supp. 3d at 868. Nor is it plausible that paying benefits to participants, as the Plan expressly allows, could be "self-dealing," given the regulatory history summarized above.

ERISA's duty of prudence requires only that a fiduciary act reasonably "under the circumstances then prevailing," as measured against how other similarly situated fiduciaries would act. *See* 29 U.S.C. § 1104(a)(1)(B); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007). Here, the "circumstances then prevailing" included Treasury regulations (existing and proposed) and Congressional guidance permitting exactly the behavior Plaintiffs complain about. Plaintiffs' allegation that SAS *must always* use forfeitures for their preferred purpose unless the Company cannot meet its obligations "evince[s] an implausible breadth" (*Hutchins II*, 767 F. Supp. 3d at 926) that contradicts the Supreme Court's instructions that the "duty of prudence turns on the circumstances prevailing at the time the fiduciary acts," so that "the appropriate inquiry will necessarily be context specific" and must "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 595 U.S. at 177.

Further, Section 514(d) of ERISA states "[n]othing [in ERISA] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any *rule or regulation* issued under any such law." 29 U.S.C. § 1144(d) (emphasis added). As such, "[t]here can be no violation of ERISA itself" by complying with federal regulations—such as the Treasury regulations that specifically allow using forfeitures just as Plaintiffs allege they were used. *First Nat. Bank of Chicago v. Comptroller of Currency of U.S.*, 956 F.2d 1360, 1368 (7th Cir. 1992) [22]

### 5. Plaintiffs Do Not State an Anti-Inurement Claim (Count III).

The Court also should dismiss Count III, which alleges that using forfeitures to offset SAS'

---

[22] Plaintiffs also allege Defendants should have "consult[ed] with an independent, non-conflicted decisionmaker to advise them in deciding upon the best course of action for allocating the forfeitures in the Plan[.]" SAC ¶ 156. But Plaintiffs cite no law, regulation, guidance, or any other source requiring a plan sponsor or fiduciary to hire an independent fiduciary to assess a plan's use of forfeitures. That is because no such law or regulation exists, and ERISA does not require the use of an independent fiduciary. Nor do Plaintiffs allege a single other "prudent person" who has ever used an independent fiduciary to decide how to allocate forfeitures for any other plan. The Court need not accept Plaintiffs' conclusory assertions. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

employer contributions "caused the assets of the Plan to inure to the benefit of the Company," violating ERISA's anti-inurement provision. SAC ¶ 183. That provision states in relevant part that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of *providing benefits to participants in the plan* and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1) (emphasis added). The Supreme Court has emphasized that this statutory language was crafted to "discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 5 (2004). Thus, the anti-inurement inquiry "focuses exclusively on whether fund assets were used to pay . . . benefits to plan participants[.]" *Hughes Aircraft*, 525 U.S. at 442.

"Applying [that] Supreme Court precedent, multiple courts throughout the country have recently concluded that the anti-inurement provision does not apply" to plan forfeitures used to offset employer contributions. *Madrigal*, 2025 WL 1299002, at *6 (collecting cases). As another court in the Fourth Circuit held when dismissing a similar claim, "because Plaintiff has not established that following such Plan terms is itself a fiduciary violation, Plaintiff similarly cannot establish that Plan assets 'inure[d] to the benefit of any employer,' or were ever held for any other reason than to 'provid[e] benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.'" *Naylor*, 2024 WL 4112322, at *7. As in that case and others, Plaintiffs here "fail[] to allege removal of plan assets for the benefit of anyone other than the Plan participants." *Dimou*, 2024 WL 4508450, at *10. Instead, Plaintiffs concede, as they must, that forfeitures stay in the Plan to be reallocated toward providing benefits to other participants. In other words, the Plan uses forfeitures for "providing benefits to participants," just as ERISA requires. 29 U.S.C. § 1103(c)(1). Presented with similar allegations, "courts have

29

repeatedly held that the internal reallocation of forfeited contributions within a plan, when conducted in accordance with plan terms, does not violate the anti-inurement provision because the assets remain inside the plan and continue to serve the interests of participants." Order, *Steen*, No. 4:24-cv-03105-JD, ECF No. 38, at 13.

To the extent Plaintiffs allege the use of forfeitures to offset employer contributions saved SAS "millions of dollars in funds that the Company would otherwise have to contribute to the Plan," SAS ¶ 183, courts have generally held that "receipt of 'incidental' benefits to an employer do not constitute a breach of the anti-inurement provision." *Hutchins I*, 737 F. Supp. 3d at 864 (citing *Hughes Aircraft*, 525 U.S. at 445). In *Hughes Aircraft*, the Supreme Court made clear that ERISA does not prohibit actions that are otherwise lawful, simply because they might benefit the employer indirectly. 525 U.S. at 445-46 (finding lower labor costs and other "incidental benefits" are not impermissible under ERISA); *see also Spink*, 517 U.S. at 892-93 (using surplus funds to offer early retirement benefits was lawful under ERISA); *McManus*, 2024 WL 4944363, at *7; *Fumich*, 2025 WL 2399134, at *7-8; *Holliday v. Xerox Corp.*, 732 F.2d 548, 551 (6th Cir. 1984) (similar). Thus, Count III fails for this reason as well.

### C. Plaintiffs' Failure-to-Monitor Claim Fails (Count IV)

Count IV claims that SAS and the Board violated a "duty to monitor" the Committee, to ensure the Committee was satisfying its own distinct duties under ERISA. This claim is wholly derivative of Plaintiffs' other claims—and because those claims fail, Count IV does as well. *Naylor*, 2024 WL 4112322, at *9; *Tullgren*, 2023 WL 2307615, at *8.

### IV. <u>CONCLUSION</u>

For all the reasons above, the Court should dismiss the SAC in its entirety, with prejudice.

30

Dated: September 4, 2025

*/s/ Deborah S. Davidson*
Deborah S. Davidson (*pro hac vice*)
Matthew A. Russell (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
110 N. Wacker Drive
Chicago, IL 60606-1511
Telephone: +1.312.324.1159
Facsimile: +1.312.324.1001
deborah.davidson@morganlewis.com
matthew.russell@morganlewis.com

Jared R. Killeen (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103
Telephone: +1.215.963.5000
Facsimile: +1.215.963.5000
jared.killeen@morganlewis.com

Pressly M. Millen (NC Bar No. 16178)
**WOMBLE BOND DICKINSON LLP**
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Phone:  919.755.2135
Fax:  919.755.6067
press.millen@wbd-us.com

*Attorneys for Defendants*

31